UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
VICINAGE OF NEWARK

J.L.D.,                                    )

           Plaintiff,                )          Civil Action No. 15-cv-00386

        v.                                )

EDWARD V. GANNON, et al.,                  )

           Defendants.               )

BRIEF OF THE DEFENDANT EDWARD V. GANNON IN SUPPORT
OF THE MOTION TO DISMISS PURSUANT
TO FED. R. CIV. P. 12(b)(6)

WILLIAM P. FLAHIVE
LAW OFFICE OF WILLIAM P. FLAHIVE, L.L.C.
Attorney for Defendant Edward V. Gannon
24 Arnett Avenue
Suite 103
Lambertville, NJ 08530
(609) 397-6390

Return Date: June 1, 2015

TABLE OF CONTENTS

Statement of Facts…………………………………………………………1

Procedural History………………………………………………………...5

Standard of Review…………………………………………………...…………9

Analysis:

        The Complaint Fails to State a Claim in
        Count One as It Does Not Allege Protected Speech
        or That Cognizable Retaliatory Action Was Taken By This
        Defendant…………………………………………………..…...….10

        Count Two Should Be Dismissed Because the Complaint
        Does Not Allege That Any Property or Liberty Interest Plaintiff
        Had In Employment Was Affected By This
        Defendant……………………………………………………...16

        Count Three Should Be Dismissed as Plaintiff Fails
        To State a Claim Under The First Three
        Prima Facie Requirements of CEPA………………………………...17

        Count Five Claiming Defamation Should Be Dismissed As
        Plaintiff Admits To Engaging in Troubling Conduct, Matters of
        Opinion Are Not Actionable, and Defendant
        Is Immune from Liability……………………………………...21

        Count Six Should Be Dismissed as the Complaint
        Does Not Allege Conduct of a Level Supporting Claims for
        Infliction of Emotional Harm…………………………………27

Conclusion………………………………………………………29

TABLE OF AUTHORITIES

<u>Cases</u>

<u>Ashcroft v. Iqbal</u>, 556 U.S. 662 (2009) . . . . . . . . . . .   9

<u>Baldassare v. State of New Jersey</u>, 250 F. 3d 188 (3d Cir. 2001) . . . . . . . .   10

<u>Beasley v. Passaic County</u>, 377 N.J. Super. 585 (App. Div. 2005) . . . . . . . .15,19,20

<u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544 (2007) . . . . . . . . . . .   9

<u>Board of Regents of State Colleges v. Roth</u>, 408 U.S. 564 (1972) . . . . . . . .   16

<u>Borden v. School District of Twp. of East Brunswick</u>, 523 F. 3d 153 (3d Cir. 2008),
   <u>cert. denied</u>, 555 U.S. 1212 (2009) . . . . . . . . . . .   11

<u>Buckley v. Trenton Savings Fund Society</u>, 111 N.J. 355 (1988) . . . . . . . . N.J. 27

<u>Caver v. City of Trenton</u>, 420 F.3d 243 (3d Cir. 2005) . . . . . . . . .   21

<u>Connick v. Myers</u>, 461 U.S. 138 (1983) . . . . . . . . . . .   10, 11

<u>Decker v. Princeton Packet, Inc.</u>, 116 N.J. 418 (1989) . . . . . . . . .   28

<u>Dun & Bradstreet Inc. v. Greenmoss Builders, Inc.</u>, 472 U.S. 749 (1985) . . . . .   11

<u>Dzwonar v. McDevitt</u>, 177 N.J. 451 (2003) . . . . . . .   . . . .   18

<u>Fees v. Trow</u>, 105 N.J. 330  (1987) . . . . . . . . . . .   22, 26

<u>Feggans v. Billington</u>, 291 N.J. Super. 382 (App. Div. 1996) . . . . . . .   22

<u>Garcetti v. Ceballos</u>, 547 U.S. 410 (2006) . . . . . . . . . .   11

<u>Gorum v. Sessoms</u>, 561 F. 3d 179 (3d. Cir. 2009) . . . . . . . . .   11, 13, 14

<u>Green v. Philadelphia Housing Authority</u>, 105 F. 3d 882 (3d Cir.), <u>cert. denied</u>,
   522 U.S. 816 (1997) . . . . . . . . . . .   10

<u>Holder v. City of Allentown</u>, 987 F. 2d 188 (3d Cir. 1993) . . . . . . .   10

<u>Keelan v. Bell Communications Research</u>, 289 N.J. Super. 531 (App. Div. 1996) . .   19

<u>Klein v. Univ. of Medicine and Dentistry of N.J.</u>, 377 N.J. Super. 28 (App. Div.),
   <u>certif. denied</u>, 185 N.J. 39 (2005) . . . . . . . . .   20

Koltikoff v. Community News, 89 N.J. 62 (1982) .  .  .  .  .  .  .  .    22, 24

Latessa v. New Jersey Racing Commission, 113 F. 3d 1313 (3d Cir. 1997) .  .    11, 16

Monroe v. Host Marriott Services, Corp., 999 F. Supp. 599 (D.N.J. 1998)  .  .    21, 22

Morris v. Philadelphia Housing Authority, 487 Fed. Appx. 37 (3d Cir. 2012).  .    12

Pickering v. Board of Education, 391 U.S. 563 (1968). .  .  .  .  .  .  .    10

Piecknick v. Commonwealth of Pennsylvania, 36 F.3d 1250 (3d Cir. 1994). .  .    16

Roach v. TRW, Inc., 164 N.J. 598 (2000) .  .  .  .  .  .  .  .  .  .    18

Veggian v. Camden Board of Education, 600 F. Supp.2d 615 (D.N.J. 2009) .  .    27, 28

Statutes and Rules

U.S. Constit., Amdt. I .  .  .  .  .  .  .  .  .  .  .  .  .  .    10

42 U.S.C. §1983.  .  .  .  .  .  .  .  .  .  .  .  .  .  .    5, 10

N.J.S.A 34:19-1 .  .  .  .  .  .  .  .  .  .  .  .  .  .    7

N.J.S.A. 34:19-3.  .  .  .  .  .  .  .  .  .  .  .  .  .    17

N.J.S.A. 59:8-8.  .  .  .  .  .  .  .  .  .  .  .  .  .    29

Fed. R. Civ. P. 12(b)(6) .  .  .  .  .  .  .  .  .  .  .  .  .    9

## STATEMENT OF FACTS

Plaintiff J.L.D. graduated from law school in May 2014.  Portions of amended complaint attached as Ex. A at ¶1.[1]  J.L.D. served as a law clerk to the Honorable Edward Gannon, Judge of the Superior Court of New Jersey, from August 25, 2014 until December 9, 2014.  On that date, plaintiff was reassigned to the Honorable Rosemary Ramsey, a Civil Presiding Judge of the Superior Court, at plaintiff's own request.  His employment with Judge Gannon ended that day. Ex. A at ¶10.

J.L.D. and Judge Gannon worked primarily in the Sussex County Courthouse in Newton. Judge Gannon is occasionally called to sit in the Morris County Courthouse in Morristown, which is in the same judicial vicinage as the Sussex County court.  Ex. A at ¶12; 2015 N.J. Lawyers Diary, at 70.

In the course of working for Judge Gannon, J.L.D. claims that he developed concerns about Judge Gannon's demeanor, the Judge's performance of judicial and administrative duties, and how J.L.D.'s skills were used.  Ex. A at ¶24, 27, 29, 33, 40, 74, [2]

---

[1] Many of the allegations in the Amended Complaint are subject to being stricken from the complaint pursuant to Fed. R. Civ. P. 12(f).  For this reason, as well to protect privacy interests and to conform with ECF redaction rules, the attached Exhibit A is the Amended Complaint that appears on the Court's docket but is submitted in truncated and redacted form.

[2] Defendant Judge Gannon vehemently denies the allegations made about his demeanor, his performance, the propriety of his actions, and his use of J.L.D.'s skills.  Defendant understands, however, the standard the Federal Rules of Civil Procedure and precedent of the United States Supreme Court, the Third Circuit of the United States Court of Appeals, and the United States District Court for the District of New Jersey require in ruling on a 12(b)(6) motion.  Thus, defendant does not waste the time and resources of the Court and the parties addressing the allegations in detail.

Plaintiff maintains that he and Judge Gannon maintained an amicable relationship prior to November 10, 2014. Ex. A at ¶73. J.L.D. admits that he never complained about the tasks given to him by Judge Gannon until November 20, 2014. Ex. A at ¶28.

J.L.D. acknowledges that he did not work on November 19 or 20, 2014. Ex. A at ¶82. He claims that he used the proper call-off procedure for taking time off from work. Ex. A at ¶83. Plaintiff indicated that he advised Judge Gannon's Chambers via text message on November 20, 2014 that he would "not be answering [his] phone today." Ex. A at ¶84.

J.L.D. alleges that Judge Gannon called him on November 20, 2014.   During the conversation, J.L.D. advised the Judge that plaintiff "enjoyed the judicial work" but that he felt "disrespected" and "taken advantage of" because he "didn't get a lot of help." Ex. A at ¶86(a) and (b).   The complaint states that <u>plaintiff</u> ended the November 20 conversation by saying <u>to Judge Gannon</u>, "they would talk next time Judge Gannon was in Chambers (December 1, 2014) so they could 'iron things out' and 'layout some rules so we are on the same page.'"   Ex. A at ¶86(e)(emphasis added).

Plaintiff claims that when he returned to work on November 21, 2014, telephone calls had to be transferred to him because his incoming calls could not be received directly on his work phone. Ex. A at ¶88.

On December 1, 2014, J.L.D. entered Judge Gannon's office within chambers and told the Judge that the Judge's "approach to his judicial and administrative duties 'killed [J.L.D.]'s motivation.'"   J.L.D. asked Judge Gannon to "work more as a team" and told the Judge "everyone needs to do their jobs." Ex. A at ¶89 & ¶90(b).

Judge Gannon told his law clerk that if he had concerns about his job J.L.D. could complain to the Human Resources office of the Vicinage or the Vicinage's Assignment Judge, the Honorable Thomas Weisenbeck. J.L.D. responded that "he did not want to do that." Ex. A at ¶90(e). The conversation ended with a handshake. Ex. A at ¶90(i).

The complaint alleges that on December 4, 2014, Judge Gannon asked J.L.D. to pick up a paycheck for another member of Judge Gannon's Chambers. Ex. A at ¶92. Plaintiff does not allege that he had to forge anyone's signature to obtain the check or that he suffered any ramifications for doing what the Judge asked him to do.

On December 5, 2014,[3] plaintiff claims he began to feel dizzy shortly after 11 a.m. He told a Court administrator he was leaving the courthouse but would be "right back." J.L.D. then sat in his car for five minutes. Ex. A at ¶100. He returned to the courthouse and spoke to the same Court administrator telling her he was "worn out." Ex. A at ¶101. When the Court administrator left, plaintiff "began to feel anxious." He stood up, got some water, and then "stood over his desk for a few minutes, at times stretching." Ex. A at ¶103.

J.L.D. then brought a file into Judge Gannon's office within chambers in a case that Judge Gannon was scheduled to hear at 1:30 p.m. He returned to his desk and "stood over his desk again for a few minutes." Despite the fact another member of Chambers was sitting ten feet away, plaintiff said nothing as he stood over his desk for minutes. Ex. A at ¶103.

Plaintiff then told the other member of Chambers he "had to go home because he felt dizzy." He told the other member of Chambers, "I'm sorry, I know the Judge is probably going

---

[3] December 5, 2014 was a motion day in the Superior Court 2014 N.J. Lawyers Diary, at 413. On a motion day before Judge Gannon, it is not unusual for an excess of 40 motions to be on the docket. See http://www.judiciary.state.nj.us/acms/MOTN/CV0390W1e.asp.

to be pissed but I really just need to get out of there right now, I just don't feel well." Ex. A. at ¶103.

J.L.D. walked outside, got in his car, and drove home.  He did not give anyone the impression that he was dissatisfied with his position or Judge Gannon in any way.  Ex. A at ¶104-105.  J.L.D. does not indicate that he received permission from anyone to leave his job or explain who from the staff or the courthouse was going to perform his role as law clerk that afternoon.

The following Monday, December 8, 2014, plaintiff did not go to work and did not notify chambers he was not coming in.  Instead, he contacted a law clerk from another Chambers and asked her to tell a Court administrator, not Judge Gannon, that plaintiff would be working from home that day to "suggest a plan to improve workplace efficiency and environment."  He specifically told that law clerk that he would not be advising Judge Gannon or his Chambers about his absence.  Ex. A at ¶109.

Thus, there is no dispute that Judge Gannon was unaware that J.L.D. was not planning to come to work that day.  There is no claim that Judge Gannon had given authorization for plaintiff to be absent Friday afternoon and the following Monday morning.

Plaintiff was contacted by Judge Gannon's Chambers on December 8 and advised to report to the Morris County Courthouse on Tuesday morning, December 9.  Judge Gannon had been assigned to conduct a trial there.  Ex. A at ¶114.  Plaintiff followed up that phone call at 3 p.m. on December 8 by contacting the Human Resources manager for the Vicinage, Susan Chait. The complaint states that J.L.D. alleged to Chait, without providing details, that Judge Gannon had engaged in judicial and administrative misconduct. Ex. A at ¶115.  This is the earliest

4

allegation that plaintiff makes that he advised anyone, including Judge Gannon, of any impropriety in which he claims Judge Gannon was engaged.[4]

J.L.D. met with Judge Gannon on December 9, 2015.  Judge Gannon advised plaintiff that he should seek some help for behavioral or mental health problems or he may be terminated. Ex. A at ¶117(f).  Immediately thereafter, plaintiff called Susan Chait and was told that he would no longer be working with Judge Gannon.  Ex. A at ¶118 & 119.  J.L.D. makes no allegation that he ever worked for Judge Gannon again or that Judge Gannon was ever again in a position to have any influence over the terms and conditions of plaintiff's employment.

Plaintiff advised Judge Gannon the next day December 10, 2015 that he had been reassigned.  Ex. A at ¶121.

Plaintiff claims he later met with Chait, Assignment Judge Weisenbeck, Judge Ramsey and the Trial Court Administrator for the Vicinage.  J.L.D. told the Judiciary members that the "the biggest issue with Judge Gannon is that 'he didn't want to do any work.'"   Ex. A at ¶123.

## PROCEDURAL HISTORY

This Court's docket indicates that on January 20, 2015 plaintiff filed a complaint under seal.  On February 13, 2015, plaintiff filed this amended complaint that appears to be the operative pleading in this matter and is the subject of the motion to dismiss. Ex. A.

Count One

Count One of the amended complaint alleges retaliation for exercise of First Amendment rights in violation of 42 U.S.C. §1983. Plaintiff claims that on November 20, 2014 and

---

[4] See footnote 2.

December 1, 2014, he spoke to Judge Gannon about a matter of public concern, the Judge's "approach to his judicial and administrative duties." Ex. A at ¶136. He claims that on December 5, 2014, he engaged in protected First Amendment activity by leaving work without permission. Ex. A at ¶138.

J.L.D. claims that as a result, Judge Gannon engaged in unspecified "retaliatory acts." Plaintiff does not even attempt to explain how the defendant New Jersey Judiciary is culpable under Count One. Ex. A at ¶139.

Count Two

Count Two alleges deprivation of due process rights in violation of 42 U.S.C. §1983 against Judge Gannon and the New Jersey Judiciary. Plaintiff alleges the due process violation consists of the fact that he left work early on December 5, 2014 without permission, and that he was not contacted by anyone to ask him "why." Ex. A at ¶144-146. He faults Judge Gannon for not asking J.L.D. "why" he left work early or "if he had been to a doctor." Ex. A at ¶147.

J.L.D. claims that some unspecified person told him he was "technically terminated," his keycard was disabled, and his reputation had been ruined, and he was advised to seek mental health treatment. Ex. A ¶150. Any claim that plaintiff was "technically terminated" or his "reputation was ruined" is contradicted directly by the fact that on December 9, 2014, plaintiff was reassigned to work with the Honorable Rosemary Ramsey, J.S.C., the Presiding Civil Judge of the Vicinage, at his own request. Ex. A at ¶10. Again, J.L.D. does not explain how the defendant New Jersey Judiciary is culpable in Count Two.

Count Three

Count Three alleges a violation of the New Jersey Conscientious Employee Protection Act (CEPA), N.J.S.A 34:19-1, by all defendants.  J.L.D. claims that on November 10, 2014, he criticized Judge Gannon's conduct with regard to a visitor to the courtroom.  He maintains that on November 20 and December 1, 2014 he "confronted" the Judge about "improper use of administrative and judicial conduct."  Ex. A at ¶155.

J.L.D. claims the Judge reacted negatively on December 1 by telling the clerk he should go to Human Resources "and get assigned."  Ex. A at ¶156.  Plaintiff admits he left the courthouse without permission on December 5, 2014, and claims he suffered four retaliatory acts as a result.  First, he claims future employment opportunities and his reputation were destroyed.  Second, he was told he was "technically terminated," his keycard was disabled, and he was advised to seek mental health treatment.  Third, he was reassigned to Judge Ramsey.  Fourth, he claims he was terminated on February 10, 2015.  Ex. A at ¶158.  Obviously, since he did not work for Judge Gannon after December 9, 2014, he is only claiming the first three acts of retaliation involved Judge Gannon.

Plaintiff makes no effort to explain how defendants the law firm of Dempsey, Dempsey and Sheehan, the law firm of Dorsey Semrau, LLC, Louis Taranto or John Tonelli could be liable under Count Three.

Count Four

Count Four alleges violation of due process rights by defendants New Jersey Judiciary, Louis Taranto and John Tonelli.  It makes no claim against defendant Judge Gannon and thus need not be addressed here.[5]

Count Five

Count Five alleges a cause of action for defamation against all defendants.  J.L.D. alleges that on December 5, 2014, Judge Gannon told unnamed third parties information that "made the Plaintiff seem violent, out of control, and mentally and emotionally unstable."  Ex. A at ¶172.

J.L.D. claims that this December 5, 2014 alleged dissemination of information to unnamed third parties permanently destroyed his reputation.  Ex. A at ¶173.

Plaintiff also claims that Judge Gannon had communication with J.L.D.'s father after J.L.D. did not appear for work and did not call-out, and defendant raised questions about plaintiff's character and mental stability.  Ex. A at 174.  J.L.D. does not explain how any other defendants are culpable under Count Five.

Count Six

Count Six alleges intentional or negligent infliction of emotional harm against all defendants.  Plaintiff suggests in his legal claims that Judge Gannon "asked him if he had been molested as a boy."  Ex. A at ¶178.  This differs significantly from plaintiff's factual description of the event.  In his factual pleadings, J.L.D. alleges that Judge Gannon asked plaintiff if he had

---

[5] See footnote 2 with regard to the factual allegations naming Judge Gannon.

been in a local Boy Scout Troop.  J.L.D. asserts that the Troop's leader had allegedly acted improperly toward Scouts.  Ex. A at ¶29(b).

Without any supporting factual allegation, plaintiff claims he was coerced into acting illegally in some unspecified way.  Ex. A at ¶179.  He claims these two events "reopened old wounds" and had caused plaintiff emotional harm.  Again, no explanation is given regarding liability of any other defendant.

## Request for Criminal Charges

The complaint contains a single page on the docket (page 39) requesting criminal charges regarding some vague conspiracy. Since the matter is clearly a civil action, and plaintiff cites no statutory or common law authority for the Court to grant civil relief in the form of criminal charges, defendant Gannon will focus solely on the counts against him that could at least potentially be legally recognizable (Counts One, Two, Three, Five and Six).

## STANDARD OF REVIEW

Fed. R. Civ. P. 12(b)(6) permits a motion in lieu of an answer where the complaint fails to state cause of action for which relief can be granted.  The motion can be used to eliminate meritless claims before the discovery process is undertaken.  Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 558 (2007).  The complaint will be dismissed if plaintiff has failed to plead grounds entitling him to relief against the moving defendant.  The complaint must set forth facts that raise a right to relief that go beyond mere conclusory allegations and speculation.  Id. at 555.

The standard applies in all federal civil cases.  Ashcroft v. Iqbal, 556 U.S. 662, 678-79 (2009).  The Court will assume that all well-pleaded factual allegations in the complaint as true. Bell Atlantic, 550 U.S. at 555

ANALYSIS

Point One

The Complaint Fails to State a Claim in
Count One as It Does Not Allege
Protected Speech or That Cognizable
Retaliatory Action Was Taken By This Defendant.

Plaintiff alleges that Judge Gannon retaliated against him for exercising his rights under the First Amendment to the United States Constitution in violation of 42 U.S.C. §1983.   A State employee's retaliation claim for engaging in protected First Amendment speech must be evaluated under a multi-step process.

First, plaintiff must establish that the speech in question was protected.   Baldassare v. State of New Jersey, 250 F. 3d 188, 194-95 (3d Cir. 2001), citing Holder v. City of Allentown, 987 F. 2d 188, 194 (3d Cir. 1993).   To do this, the speech must involve a matter of public concern.   Baldassare, 250 F. 3d at 195, citing Connick v. Myers, 461 U.S. 138, 147 (1983).

If this threshold is met, plaintiff must then demonstrate that his interest in this speech outweighs the State's countervailing interest as an employer.   Baldassare, 250 F.3d at 195, citing Pickering v. Board of Education, 391 U.S. 563, 568 (1968).   These first two issues are questions of law for the Court.   Baldassare, 250 F.3d at 195, citing Green v. Philadelphia Housing Authority, 105 F. 3d 882, 885 (3d Cir.), cert. denied, 522 U.S. 816.

If this initial two-part step is met, the two additional steps required for plaintiff are showing that the protected activity was a substantial motivating factor for adverse action and demonstrating that the employer would not have taken the same adverse job action absent the protected conduct.   Baldassare, 105 F.3d at 195 (citations omitted).   As the threshold issue of

whether the "speech" was a protected activity is a matter of law and determinative of the dismissal of Count One, defendant Gannon will limit argument to this one decisive point.

A statement by a public employee is protected by the First Amendment when (1) in making it, the employee spoke as a citizen, as opposed to speaking as an employee, and (2) the statement involved a matter of public concern. Gorum v. Sessoms, 561 F. 3d 179, 185 (3d. Cir. 2009). When an employee makes a statement in his "official duties," he is not speaking as a "citizen," and therefore, is not entitled to First Amendment protection. Id., citing Garcetti v. Ceballos, 547 U.S. 410, 421 (2006).

Whether an employee's speech addresses a "public concern" is determined by the content, form, and context of the statement in question. Gorum, 561 F.3d at 187, citing Connick, 461 U.S. at 147-48. If the content of the employee's speech addresses social or political concerns of the community it generally raises First Amendment concerns. Gorum, 561 F. 3d at 187, citing Borden v. School District of Twp. of East Brunswick, 523 U.S. 153, 169-70 (3d Cir. 2008), cert. denied, 555 U.S. 1212 (2009).

Speech on matters of private concern does not raise First Amendment issues because there is no threat to free and robust discussion of public issues. Gorum, 561 F. 3d at 187, citing Dun & Bradstreet Inc. v. Greenmoss Builders, Inc., 472 U.S. 749, 759-60 (1985).

"For speech by a government employee to be protected, it must be regarding a public concern, as opposed to employment matters, unrelated to such concerns." Latessa v. New Jersey Racing Commission, 113 F. 3d 1313, 1319 (3d Cir. 1997) citing Connick, 461 U.S. at 142. The Third Circuit of the United States Court of Appeals has "consistently held that complaints up the chain of command about issues related to an employee's work place duties" are not matters of

public concern but rather fall within their "official duties."   <u>Morris v. Philadelphia Housing Authority</u>, 487 Fed. Appx. 37, 39 (3d Cir. 2012).

In conducting this analysis, the Court must focus not on the conclusory allegations raised in the Amended Complaint, but rather plaintiff's own factual pleadings as to his interaction with Judge Gannon before he left Judge Gannon's employ on December 9.   J.L.D.'s own description of his interaction with Judge Gannon demonstrates that the complaint fails to state a cause of action against this defendant.   The complaint states that J.L.D. never complained about the tasks given to him by Judge Gannon until November 20, 2014.   Ex. A at ¶28.   The November 20, 2014 contact came when Judge Gannon called plaintiff.   The law clerk had not come to work on November 19, 2014 or November 20, 2014 and had advised the Judge's chambers that on November 20, he would not be answering his phone.   Ex. A at ¶82-83.

J.L.D. describes the November 20 conversation as the law clerk advising the Judge that he "enjoyed the judicial work" but that he felt "disrespected" and "taken advantage of" because he "didn't get a lot of help."   Ex. A at ¶86(a) and (b).   The complaint states that J.L.D. ended the conversation by saying to the Judge, that "they would talk next time Judge Gannon was in Chambers (December 1, 2014) so they could 'iron things out' and 'layout some ground rules so we are on the same page.'"   Ex. A at ¶86(e).

On December 1, 2014, J.L.D. entered Judge Gannon's office and told the Judge that the Judge's "approach to his judicial and administrative duties 'killed [J.L.D.]'s motivation.'"   J.L.D. asked Judge Gannon to "work more as a 'team'" and told the Judge "everyone needs to do their jobs."   Ex. A at ¶90(b).

Even taking all of plaintiff factual allegations as true, the complaint describes speech concerning workplace duties and the distribution of work in chambers, not an issue of public concern.

In a rather measured response to a recent law school graduate, Judge Gannon told his law clerk that if he had concerns about his job he could complain to Human Resources or Assignment Judge Weisenbeck, the supervising Superior Court Judge for all civil, criminal and chancery judges in the entire vicinage. J.L.D. responded that "he did not want to do that." Ex. A at ¶90(e). The conversation ended with a handshake. Ex. A at ¶90(i). Nothing in the complaint suggests that plaintiff's communication addressed a violation of any law or any social or political concern of public import. See Gorum, 561 F.3d at 187.

On December 5, 2014, plaintiff admits that he left chambers to sit in his car during the morning, told a Court administrator that he was "worn out," "stood over his desk again for a few minutes" without apparently doing any work or speaking to another member of chambers sitting ten feet away. All J.L.D. acknowledges doing was "stretching." Ex. A at ¶100, 101, 103.

J.L.D. then brought a file into Judge Gannon's office, and told the other member of chambers he "had to go home because he felt dizzy." He told the other member of chambers, "I'm sorry, I know the Judge is probably going to be pissed but I really just need to get out of there right now, I just don't feel well." Ex. A. at ¶103. He did not give anyone the impression that he was dissatisfied with his position or Judge Gannon in any way. Ex. A at ¶105.

J.L.D. walked outside, got in his car, and drove home. Ex. A at ¶104. The complaint does not indicate that he received permission from anyone to leave his job or explain who was going to perform his role as law clerk that afternoon. While plaintiff now claims that walking

out of work was "protected speech," the facts as alleged demonstrate that he gave no one the impression that he left because of some public protest about the position or Judge Gannon.  He gave no indication he was leaving without permission due to any concern about a violation of law or any social or political concern involving the public interest.   Thus, retaliation for such "protected speech" would be impossible.  Plaintiff's speech to Judge Gannon and his actions in leaving work were not protected under the First Amendment.  Gorum, 561 F.3d at 187.

The following Monday, December 8, 2014, plaintiff did not notify chambers he was not coming in.  In fact, he specifically told a law clerk from a different chambers that he would not be advising Judge Gannon or his Chambers about his absence.  Ex. A at ¶109.  Plaintiff was contacted by Judge Gannon's chambers and advised to report to the Morris County Courthouse Tuesday morning, December 9, as Judge Gannon had been assigned to hear a case there.  Ex. A at ¶114.  Plaintiff followed up at 3 p.m. by contacting the Human Resources manager for the Vicinage, and alleged for the first time, without providing details, that Judge Gannon had engaged in judicial and administrative misconduct. Ex. A at ¶115.

J.L.D. met with Judge Gannon on December 9, 2015.  J.L.D. makes no allegation that he had told Judge Gannon anything to this point other than he felt "disrespected" and "taken advantage of" because he "didn't get a lot of help," that the Judge's "approach to his judicial and administrative duties 'killed [J.L.D.]'s motivation.'"  Ex. A at ¶86(a) and (b), ¶90(b).

Plaintiff claims that Judge Gannon advised plaintiff that he should seek some counseling or he may be terminated.  Ex. A at ¶117(f).  Immediately thereafter, plaintiff called Susan Chait and he was told that he would no longer be working with Judge Gannon.  Ex. A at ¶118 & 119.

J.L.D. never worked for Judge Gannon again and Judge Gannon was never in a position to have any influence over the terms and conditions of plaintiff's employment.[6]

Even if plaintiff could demonstrate he engaged in protected speech, he has no viable claim that Judge Gannon retaliated against him.  In terms of retaliatory actions, plaintiff claims that when he returned to work on November 21, 2014, calls had to be transferred to him because his incoming calls could not be received directly on his work phone. Ex. A at ¶88.  This does not even allege any permanent or serious retaliatory act.  See Beasley v. Passaic County, 377 N.J. Super. 585, 606, 608 (App. Div. 2005)

The complaint alleges that on December 4, 2014, Judge Gannon asked J.L.D. to pick up a paycheck for another member of Judge Gannon's Chambers.  Ex. A at ¶92.  Plaintiff does not allege that he forged anyone's signature to obtain the check or suffered any ramifications for doing what the Judge asked him to do.  Thus, such a request is inconsequential as it relates to First Amendment claims.

The only other alleged job action was Judge Gannon suggesting that J.L.D. should seek counseling or he could be terminated.  Plaintiff was not terminated by Judge Gannon.  In fact, on December 9, 2014 plaintiff was reassigned to work with Judge Gannon's supervisor, the Presiding Civil Judge of the vicinage, Judge Ramsey.   One could argue that plaintiff actually improved his reputation and his resume by adding the credential of having the experience of

---

[6] Plaintiff claims that on December 10, 2014, he met with Chait, Assignment Judge Weisenbeck, Judge Ramsey and the Trial Court Administrator for the Vicinage.  J.L.D. told the Judiciary members that the "the biggest issue with Judge Gannon is that 'he didn't want to do any work.'"  Ex. A at ¶123.  While not important to the motion of this defendant, this suggests that J.L.D.'s speech with the Judiciary was simply complaint about his workload that was not protected speech.

working for a Presiding Civil Judge in the Superior Court. Count One should be dismissed as to Judge Gannon.

Point Two

Count Two Should Be Dismissed<br>
Because The Complaint Does Not Allege<br>
That Any Property or Liberty Interest Plaintiff<br>
Had In Employment Was Affected<br>
By This Defendant

Although the complaint is unclear, for purposes of this motion the defendant will assume that plaintiff's Fourteenth Amendment due process claim is related to an alleged liberty or property interest in employment as a law clerk.

To succeed on a deprivation of due process claim, a plaintiff must either establish a liberty interest in pursuing a calling or occupation that may have been affected by some stigma caused by defendant, or establish the existence of a property interest in some particular employment. Latessa, 113 F. 3d at 1317-18, citing Piecknick v. Commonwealth of Pennsylvania, 36 F.3d 1250, 1259 (3d Cir. 1994), Board of Regents of State Colleges v. Roth, 408 U.S. 564, 572, 576 (1972). To have such a property interest, an employee must have a legitimate claim of entitlement to the job that was affected without due process. Latessa, 113 F. 3d at 1318, citing Roth, 408 at 577.

Plaintiff can cite no precedent for his claims that due process was violated because no one asked him "why" he left work on December 5, 2014 and Judge Gannon did not ask if he had "been to a doctor." Ex. A at ¶144-47.

Plaintiff did not lose his job as a law clerk as a result of any action taken by Judge Gannon. Plaintiff admits that on December 9, 2014, he was reassigned to the Honorable

Rosemary Ramsey, J.S.C. at his own request.   Ex. A at ¶10.  According to plaintiff's complaint, he was employed by the Judiciary until February 10, 2015.  Ex. A at ¶158(d).

Thus, plaintiff has no claim that a "liberty" interest in pursuing a calling or an occupation was affected by any stigma caused by this defendant.  Plaintiff continued to serve as a law clerk as of December 9, 2014 and was free to pursue any calling or occupation he chose.  While plaintiff will not be able to establish a property interest in his role as a law clerk, the Court need not reach that question with regard to this motion.  The record is undisputed that no action of Judge Gannon affected J.L.D. serving as a law clerk after December 9, 2014.

Plaintiff does not even allege that any action of Judge Gannon affected a liberty or property interest plaintiff may have had.  Thus, Count Two should be dismissed as to Judge Gannon.

Point Three

Count Three Should Be
Dismissed as Plaintiff Fails
To State a Claim
Under The First Three
Prima Facie Requirements of CEPA.

The New Jersey CEPA prohibits an employer from taking retaliatory action against an employee for disclosing "to a supervisor or to a public body an activity, policy, or practice of the employer ... that the employee reasonably believes is in violation of a law, or a rule or regulation promulgated pursuant to law." N.J.S.A. 34:19-3.

To state a prima facie case under CEPA, an employee must show (1) he had a reasonable belief that his employer's conduct was violating a law, rule or regulation, (2) that he performed a

whistleblowing activity, (3) an adverse employment action was taken toward him, and (4) a causal connection can be demonstrated between the whistleblowing disclosure and the adverse employment action taken toward him. Dzwonar v. McDevitt, 177 N.J. 451, 462 (2003)(citations omitted).

To meet the first of the four prongs of demonstrating a prima facie case under CEPA, plaintiff must "set forth facts that would support an objectively reasonable belief that a violation occurred." Dzwonar, 177 N.J. at 464. A defendant may request the trial court to determine as a matter of law whether plaintiff's belief that a law was violated was objectively reasonable. The Court must then make a threshold determination "that there is a substantial nexus between the complained-of-conduct and the law or policy identified by the court or plaintiff." Id. at 464.

"CEPA is intended to protect those employees whose disclosures fall sensibly within the statute; it is not intended to spawn litigation" concerning trivial or benign complaints that fall outside the law. Roach v. TRW, Inc., 164 N.J. 598, 613-14 (2000).

While plaintiff claims he "criticized" the Judge with regard to a visitor to the courtroom on November 10, 2014, the complaint contains no explanation of a disclosure of a violation of a law, rule or regulation to Judge Gannon. Plaintiff pleads no facts suggesting he said anything to Judge Gannon about any concerns he had about a visitor to the courtroom that day.

Plaintiff does allege that on November 20, 2014, he advised Judge Gannon that he felt "disrespected" and "taken advantage of" because he "didn't get a lot of help." Ex. A at ¶86(a) and (b). On December 1, 2014, J.L.D. told the Judge that his "approach to his judicial and administrative duties 'killed [J.L.D.]'s motivation.'" He asked Judge Gannon to "work more as a 'team'" and told the Judge "everyone needs to do their jobs." Ex. A at ¶90(b). These

18

communications suggest that plaintiff was unhappy with his quantity of work and perhaps the Judge's role in that work.[7]  Such allegations, even taken as true, do not demonstrate that J.L.D. communicated a reasonable belief at the time that some law, rule or regulation had been violated by Judge Gannon or the Judiciary.  Plaintiff felt he was overworked as a law clerk.

To meet the second prong of a prima facie case under CEPA, plaintiff must show he engaged in a whistleblowing activity.  This is defined by the statute as disclosing or threatening to disclose to a supervisor or public body an activity, policy or practice of the employer the employee reasonably believes is a violation of law, rule or regulation.  N.J.S.A. 34:19-3(a).

By the time Judge Gannon ceased being plaintiff's employer, at J.L.D.'s own request, plaintiff had only engaged in the conversations with Judge Gannon about his concerns on November 20 and December 1, 2014.  As noted above, these conversations amount to complaints that the law clerk felt disrespected in that he was doing an inordinate amount of the work of the Judge's Chambers and was asking the Judge to do more.  Claiming he was "overworked" does not constitute "whistleblowing" activity as described in the statute.

To meet the third prong of a prima facie case under CEPA[8] plaintiff must make some showing of an adverse or retaliatory job action.  Retaliatory action is defined under CEPA as the "discharge, suspension, or demotion of an employee or other adverse employment action taken in the terms and conditions of employment."  N.J.S.A. 34:19-2(e).  The definition of retaliatory action "speaks in terms of completed action."  Beasley v. Passaic County, 377 N.J. Super. at 606, quoting, Keelan v. Bell Communications Research, 289 N.J. Super. 531, 539 (App. Div. 1996).

---

[7] See footnote 2.
[8] As Plaintiff fails to meet the first three prongs of a prima facie case under CEPA, the fourth prong, showing a causal nexus, need not be addressed.

Adverse employment action may include "serious intrusions into the employment relationship beyond those solely affecting compensation and rank." Beasley, 377 N.J. Super. at 608. These could include the length of the workday, increase or decrease in salary or fringe benefits, or physical arrangements or facilities. Id. (citations omitted).

Adverse employment action does not qualify as retaliation under CEPA simply because it results in a "bruised ego or injured pride" on the part of the employee. CEPA is designed to protect whistleblowers, not to settle internal disputes within the workplace. Beasley, 377 N.J. Super. at 607, citing, Klein v. Univ. of Medicine and Dentistry of N.J., 377 N.J. Super. 28, 45-46 (App. Div. ), certif. denied, 185 N.J. 39 (2005).

The complaint claims that on November 21, 2014, plaintiff was not receiving direct calls to his work telephone. Ex. A at ¶88. The complaint alleges that on December 4, 2014, Judge Gannon asked J.L.D. to pick up a paycheck for another member of Judge Gannon's Chambers. Ex. A at ¶92. Plaintiff does not allege that he forged anyone's signature to obtain the check or suffered any ramifications for doing what the Judge asked him to do.

The only other alleged "job action" was Judge Gannon's suggesting that J.L.D. should seek counseling or he could be terminated.

Plaintiff's examples of alleged retaliatory actions by Judge Gannon do not amount to adverse job action under CEPA. The allegation that on November 21, 2014 calls had to be transferred to J.L.D. contains no indicia of seriousness or the permanence required to show adverse action. Beasley, 377 N.J. at 606, 608. Similarly, the direction to pick up another employee's paycheck may have offended plaintiff's pride, but does not amount to adverse job action, is not permanent, and is not a serious intrusion into the employment relationship. Id.

Plaintiff's claim that future employment opportunities were destroyed or his reputation was affected by Judge Gannon is obviously without merit as he began working for Judge Ramsey at plaintiff's own request on December 10, 2014. Any claim that he was "technically terminated" or his keycard was disabled is of no consequence as he suffered no lapse in employment or inability to report to work because of Judge Gannon.

Judge Gannon's advising J.L.D. that he should seek counseling or may face termination is similarly not permanent and did not result in a change in the terms or conditions of J.L.D.'s employment. J.L.D. was working for another Judge the following day. Furthermore, even if Judge Gannon had ordered J.L.D. to have an evaluation done, it would not have constituted an adverse employment action under CEPA. Caver v. City of Trenton, 420 F.3d 243, 256 (3d Cir. 2005).

Plaintiff fails to meet any of the first three prongs of a prima facie showing under CEPA. Therefore, Count Three should be dismissed.

## Point Four

### Count Five Claiming Defamation Should Be Dismissed As Plaintiff Admits To Engaging in Troubling Conduct, Matters of Opinion Are Not Actionable, and Defendant Is Immune from Liability

Under New Jersey common law, plaintiff states a prima facie case for defamation by demonstrating (1) a defamatory statement of fact; (2) concerning the plaintiff; (3) that was false; (4) that was communicated to a person other than the plaintiff; (5) with actual knowledge or with reckless disregard of the statement's falsity; (6) which caused damage. Monroe v. Host Marriott

Services, Corp., 999 F. Supp. 599, 603 (D.N.J. 1998)(J. Irenas), citing Feggans v. Billington, 291 N.J. Super. 382, 391 (App. Div. 1996).

The question of whether language used by the defendant has defamatory meaning and whether it was a statement of fact or an opinion are threshold issues to be decided by the Court. Koltikoff v. Community News, 89 N.J. 62, 67 (1982) (citations omitted). "Pure" expressions of opinion, those in which the speaker states facts on which he bases his opinion and then states his opinion are protected speech and not actionable. Id. at 68-69.

Privileges may apply even to purely factual statements. Courts have recognized the existence of a privilege in situations where a person needs be free from fear of a defamation action, even if facts stated turn out to be unreliable. This privilege applies where the public interest or public concern, such as a safety interest, outweighs an individual's reputational interest. Fees v. Trow, 105 N.J. 330, 336 (1987). This "qualified" privilege can be lost if the communication is not made to one who was a corresponding interest in the information. Id. at 338.

The test the Court may apply with regard to this qualified privilege is two-fold. First, whether the defendant made his report to someone with a "corresponding interest" in the information, and second whether defendant was motivated primarily by "ill will" or malice. Id. at 342. In some instances, even reading all allegations in a light most favorable to the plaintiff, the defendant may still be entitled to judgment as a matter of law under this qualified privilege. Id. at 342-43.

The facts as alleged by plaintiff are that on December 5, 2014, plaintiff began to feel dizzy shortly after 11 a.m. He told a Court administrator he was leaving the courthouse but

would be "right back." He then sat in his car for five minutes. Ex. A at ¶100.  J.L.D. then

returned to the Courthouse and spoke to the same Court administrator telling her he was "worn

out." Ex. A at ¶101. When the Court administrator left, plaintiff "began to feel anxious."  He

stood up, got some water, and then "stood over his desk for a few minutes, at times stretching."

Ex. A at ¶103.

J.L.D. then brought a file in a case that Judge Gannon was scheduled to hear at 1:30 p.m.

into Judge Gannon's office.  J.L.D. returned to his desk and "stood over his desk again for a few

minutes."  Despite the fact another member of Chambers was sitting ten feet away, plaintiff said

nothing as he again stood over his desk for minutes. Ex. A at ¶103.

Plaintiff then told the other member of chambers he "had to go home because he felt

dizzy."  He told the other member of chambers, "I'm sorry, I know the Judge is probably going

to be pissed but I really just need to get out of there right now, I just don't feel well." Ex. A. at

¶103.

J.L.D. walked outside, got in his car, and drove home.  He did not give anyone the

impression that he was dissatisfied with his position or Judge Gannon in any way. Ex. A at

¶104-105.  J.L.D. does not indicate that he received permission from anyone to leave his job or

explain who was going to perform his role as law clerk that afternoon, an event that would leave

a significant burden on the remaining members of chambers and could affect the operations of

the Superior Court.

Plaintiff alleges that after he left, Judge Gannon had told some other Judges, Court staff

and unspecified people that J.L.D. had "thrown something," and "stormed out." Ex. A at ¶106.

J.L.D. claims that on December 8, 2014, Judge Gannon called plaintiff's father and said he had

"thrown something," and "stormed out."  Ex. A at ¶111.  J.L.D. was reassigned to work with Judge Ramsey the next day.

Plaintiff's claim for defamation fails for at least five reasons.  First, plaintiff admits to engaging in strange and aberrant behavior in Judge Gannon's Chambers on  December 5, 2014. He admits that he left work to sit in his car, told a Court administrator he was "worn out," stood at his desk for long periods of time, not working, not talking with staff, but only occasionally "stretching."  He then abandoned his position without permission and told the other member of Chambers he was leaving despite the fact he knew the Judge would be upset about it.

Thus, even if it were true that Judge Gannon told other Judges in the courthouse or Court staff that plaintiff had acted strangely and inappropriately, such statements were true.  "Throwing something" would be an inconsequential detail among plaintiff's admitted bizarre behavior. Plaintiff basically admits the truth of a report that he was acting in a strange and inappropriate manner.

If Judge Gannon had said that plaintiff "stormed out" it could be viewed as a factual description of plaintiff leaving without permission or an opinion of Judge Gannon as relayed by Chambers staff.  Opinion based on stated facts, which could include plaintiff's admitted strange behavior, would not be actionable. Koltikoff, 89 N.J. at 68-69.  Judge Gannon's expressions of opinion about plaintiff, or characterizing his leaving without permission as "storming out," are not actionable.  Communications of these opinions constitutes the second reason the defamation claim fails as a matter of law.

If, as alleged, Judge Gannon gave the impression to others that J.L.D. "seemed" "violent, out of control, and mentally and emotionally unstable" (Ex. A at ¶172), this is a matter of

opinion. Plaintiff sitting in his car during work hours, standing over his desk without working or talking, "stretching" at his desk, telling a Court administrator he was "worn out," and leaving work without permission are an objectively reasonable bases to reach this opinion. How J.L.D. "seemed" to Judge Gannon, based on what Judge Gannon had seen and heard would be the defendant's opinion of the law clerk and would not be actionable.

The third reason that the defamation claim fails is that Judge Gannon's alleged comments about "throwing something" or "storming out," caused no damage to plaintiff. Plaintiff was reassigned, at his own request. On December 9, he was reassigned to work with Presiding Judge Ramsey. Thus, even if Judge Gannon spoke to other Judges, Court staff, or unnamed third parties on December 5, it did not affect plaintiff's job or career.

The fourth reason the defamation claim fails is that even if all of plaintiff's allegation are taken as true, Judge Gannon had a privilege in making such communications. A law clerk acting in an undisputedly bizarre manner in a Court complex with other Judges, court staff, and third parties raises an issue of concern for others in the area. Other Judges and staff would have corresponding interest in knowing such information. Furthermore, a law clerk, leaving chambers without permission, especially on a motion day in Superior Court, could have ramifications for other staff and possibly other Judges in the way that the Superior Court will complete its business that day.

Similarly, Judge Gannon's contacting J.L.D.'s father after plaintiff had left work without permission on Friday afternoon and did not appear for work Monday morning without explanation raises a concern for a Judge, the law clerk's family, and potentially other people.

J.L.D.'s father obviously had a corresponding interest in potential issues with his son. Thus, the first requirement of the qualified privilege under Fees is met.

Based on plaintiff's own account of his communications with Judge Gannon, the facts as alleged by plaintiff would give the defendant no incentive to exercise any "ill will" toward the plaintiff in communications on December 5 and December 8, 2015. The Judge had already directed plaintiff to direct any concerns he had to Human Resources or Judge Weisenbeck. Ex. A at ¶90(e).

Plaintiff's complaint does not plead any factual basis as to why defendant would act out of "ill will" in the communications of December 5 and 8. Plaintiff does not claim that he shared his allegations of impropriety with Judge Gannon before December 5. All Judge Gannon was allegedly told was that the law clerk was overworked. Plaintiff has pleaded no facts suggesting Judge Gannon was aware of the claims plaintiff would later raise in this complaint. No pleaded facts refute that Judge Gannon acted out concern for Court staff and out of concern for plaintiff. Thus, the privilege should apply.

The fifth reason the defamation claim fails is that there is no dispute that Judge Gannon did not witness any of the Chambers behavior of December 5 that is now admitted by J.L.D. The Judge had to rely on information provided about plaintiff's behavior from others who witnessed it between 11 a.m. and when J.L.D. left before the 1:30 p.m. arguments. Plaintiff has pleaded no facts to suggest that Judge Gannon acted with actual knowledge or reckless disregard whether the information provided to him and allegedly shared with Court personnel and plaintiff's father was false. Besides not admitting that "something" was thrown, plaintiff's pleadings demonstrate a clear factual basis to have Judge Gannon believe that something as

small as "throwing something" could have happened.  Such a small detail would be consistent with the behavior described by plaintiff in his own complain.  Plaintiff pleads no facts suggesting that Judge Gannon knowingly or recklessly passed on a false information description of plaintiff's actions.

For these five reasons, Count Five alleging defamation should be dismissed as to Judge Gannon.

Point Five

Count Six Should Be
Dismissed as the Complaint
Does Not Allege Conduct of a
Level Supporting Claims for
Infliction of Emotional Harm

To state a claim for intentional infliction of emotional distress, J.L.D. must establish (1) intentional and outrageous conduct by Judge Gannon; (2) that proximately caused emotional injury; (3) that is severe.  Veggian v. Camden Board of Education, 600 F. Supp.2d  615, 629 (D.N.J. 2009) (J. Hillman), citing Buckley v. Trenton Savings Fund Society, 111 N.J. 355 (1988).

Plaintiff must show that defendant intended the alleged act to produce emotional distress and that the defendant's behavior was so extreme and outrageous that it goes beyond all bounds of decency and would be regarded as intolerable in a civilized society.  Veggian, 600 F. Supp. 2d at 629.

J.L.D. alleges that Judge Gannon asked plaintiff if he had been in a local Boy Scout Troop.  Plaintiff claims that the Troop's leader had allegedly acted improperly toward Scouts.

Ex. A at ¶29(b). Plaintiff's pleadings give no factual basis to sufficiently suggest that such a question, even if asked, was intended to produce extreme emotional distress in plaintiff. In fact, plaintiff describes himself as having no problems with Judge Gannon until November 10, 2014. This indicates no extreme emotional distress affected his relationship with Judge Gannon to that point.

This is also not the type of question (whether someone belonged to a particular Boy Scout Troop that had allegedly been in the news) that would be so extreme and outrageous as to be considered intolerable in a civil society. If plaintiff's allegation are taken as true, and even if plaintiff had provided some evidence that Judge Gannon had broached the subject of plaintiff being victimized at some point,[9] such a question would not rise to the level of severity to meet the standard discussed in Veggian. 600 F.Supp.2d at 629.

In Decker v. Princeton Packet, Inc., 116 N.J. 418 (1989), the New Jersey Supreme Court noted that in the tort of negligent infliction of emotional harm, the plaintiff would have to show the defendant was negligent and that the negligence proximately caused plaintiff's injury. 116 N.J. at 429. The negligence prong depends on whether defendant owed a duty of care that the Court links to foreseeability. Id. Liability will depend on the defendant "foreseeing fright or shock severe enough to cause substantial injury to a person normally constituted." Id. citing Caputzal v. Lindsay Co., 48 N.J. 69, 76 (1966).

In this instance, the allegation that Judge Gannon asked his law clerk if he was a member of a local Boy Scout Troop does not suggest the defendant would foresee "fright or shock" severe enough to cause significant injury to the average person. As noted above, plaintiff's own

---

[9] See footnote 2.

complaint states that he had no problems with Judge Gannon until 10 days before he first raised concerns about his workload on November 20, 2014. Thus, not only was "significant injury" not foreseeable from the question about the Boy Scout Troop, it did not happen.

The complaint fails to state a claim for either intentional or negligent infliction of emotional harm. Count Six should be dismissed.[10]

### Conclusion

For the reasons stated above, the complaint against defendant Judge Gannon should be dismissed for failure to state a claim.

LAW OFFICE OF
WILLIAM P. FLAHIVE, L.L.C.

By: _____

William P. Flahive

Date: 5/5/15

---

[10] It should be noted that plaintiff's attempt to bring suit on tort issues, such as Counts Five and Six, is procedurally defective as he has not followed the requirements of the New Jersey Tort Claims Act. Even if plaintiff filed a Tort Claim Notice on December 26, 2014 as alleged (Ex. A at ¶132), he has not met the six-month time restriction of N.J.S.A. 59:8-8 before filing suit. Because these claims should be dismissed on the merits as set forth above, the Court need not reach this issue at present.

# Exhibit A

RECEIVED

FEB 1 3 2015

PRO SE, JOSEPH L. DEARIE, JR., JD.[1]

AT 8:30_____ 9 : 58 AM
WILLIAM T. WALSH, CLERK

UNITED STATES DISTRICT COURT
DISTRICT COURT OF NEW JERSEY

Civil Action No.:  2:15-cv-00386

---

J.L.D,

        Plaintiff,

v.

EDWARD V. GANNON,
THE NEW JERSEY JUDICIARY,
STATE OF NEW JERSEY,
DEMPSEY DEMPSEY AND SHEEHAN,
DORSEY SAMARU LLC,
LOUIS TARANTO,
JOHN A. TONELLI

        Defendants.

---

**AMENDED COMPLAINT
DEMAND FOR JURY TRIAL**


**REQUEST FOR CRIMINAL CHARGES
FOR CONSPIRACY**

---

[1] Awaits admission to the New Jersey and New York Bar.

1

## I. PARTIES

1.      Pro se, Plaintiff, J.L.D., graduated law school in May 2014.  He was hired by Judge

Edward V. Gannon to be his judicial law clerk for the 2014 to 2015 term.

### III. <u>FACTUAL ALLEGATIONS</u>

A. <u>General Factual Overview</u>

10.    In late June 2014, J.L.D. interviewed with Judge Gannon twice for his law clerk position

for the 2014-2015 term. J.L.D. was offered the position in mid-July, and started on August 25, 2014.  At

---

[2] See Rudolph v. Adamar of N.J., Inc., 153 F. Supp. 2d 528 (BNA) 812 (D.N.J. 2001).

J.L.D's request, he was reassigned to Judge Rosemary E. Ramsay on December 9, 2014 in response to his December 8, 2014 letter. (Ex. A)

      12.     At all times herein, Judge Gannon's chambers was located in the Historic County Courthouse, in Newton, NJ ("Historic Courthouse"). Judge Gannon was the only judge in this courthouse. His chambers, at all times herein, were located on the second floor of the building. Only Judge Gannon, his secretary (L.H.), his court clerk (P.W.), court reporter (P.N.), and J.L.D. worked on this floor.

<u>Judge Gannon's Administrative Misconduct during J.L.D's Term (Prior to November 10, 2014)</u>

     24.    On August 28, 2014, during J.L.D's training week, Judge Gannon asked J.L.D. to type up a list of his personal medications. (Ex. C) Judge Gannon specifically told J.L.D. to save the document so he could update it throughout the year.

     27.    During the period between August 28, 2014 to December 1, 2014 J.L.D. spent a substantial amount of his time at work doing Judge Gannon's personal tasks, these included, but are not limited to:

         a)     Fixing Judge Gannon's internet at his house;

         b)     Driving Judge Gannon to his house to get his mail;

         c).     Waiting in the car outside his Judge Gannon's house for 30 minutes

         e)     Regularly getting Judge Gannon coffee, and soda at a nearby market

         f)     Typing up a detailed order list for a décor box for WWII medals;

g)    Delivering closed packages/containers to the "New Courthouse" for "personal matters;"

h)    Researching parking and travel information for the Chicago Bears football team (specifically regarding their November 23rd, 2014 game against the Miami Dolphins);[14]

i)    Looking up driving directions to a funeral service Judge Gannon was attending for a person with no connection to the New Jersey Judiciary or J.L.D.;

j)    Getting a specific judge or attorney on the phone so Judge Gannon could speak with them about personal matters;

k)    Performing research on a judge's free speech rights on the bench and in the press for purposes of Judge Gannon's personal affairs.

l)    Also see ¶ 63.

28.    J.L.D. never complained or hesitated to do these tasks before November 20, 2014.

29.    Judge Gannon made many disturbing comments in chambers as well as general derogatory remarks.  The following are examples of comments Judge Gannon made to J.L.D. (note: specific names are intentionally removed from this complaint):


b)    Judge Gannon asked J.L.D. during lunch in front of chambers staff if he was in a group of boy scouts located by J.L.D's hometown; he then immediately made reference to a boy scout troop leader who molested children in that group of boy scouts during the time period that J.L.D would have been a potential molestation victim.   J.L.D asked Judge Gannon "would you have told me that story if I said I was in boy scouts?" Judge Gannon responded, "Yeah, that was the point."

33.    Of the 300-400 motions that were assigned to Judge Gannon during J.L.D's clerkship tenure, it is only possible for Judge Gannon to have fully read motions pertaining to three ("3") cases. These cases are  Lamar v. New Jersey[16]; "The Walmart case;" and the "The Wildwest City Case."

40.    J.L.D. often encouraged Judge Gannon to read his statement of reasons or partake in the judicial decision making process:

---

[16] Judge Gannon took this file home after after Pro se plaintiff, Todd Lamar filed a motion to hold Judge Gannon in contempt and wrote a letter to Chris Christie attacking Judge Gannon's judicial integrity.

B. **Timeline of Events**

73.     Prior to November 10, 2014, despite Judge Gannon's misconduct, J.L.D. and Judge

Gannon maintained an amicable relationship.  J.L.D. stopped eating lunch with Judge Gannon in October

2014 shortly after the "molestation" comment (¶29 (b)) in order to accomplish this.

**November 10, 2014: Judge Gannon Interrogates L.M.**

74.     On or around November 10, 2014, L.M. an employee at Gurin Associates Inc., observed

trial before Judge Gannon.[20] Based on information and belief, L.M. did not know Judge Gannon or

anybody from his chambers.  During trial intermission, Judge Gannon asked J.L.D. to give L.M. a closed

envelope bearing the New Jersey Judiciary seal and Judge Gannon's judicial letterhead. Inside the

envelope contained Judge Gannon's business card, also bearing the New Jersey Judiciary seal with a

message handwritten on the back of the card which said "meet me in my chambers after the verdict."

Judge Gannon also instructed J.L.D. to ask L.M. for her business card.  After performing the task Judge

Gannon then asked J.L.D. to look L.M. up on "Facebook" and perform general research on her.  Judge

Gannon lead J.L.D. to believe the reason for looking up L.M. was due to his sexual interest in her.

However based on information and belief it was because Judge Gannon was fearful of L.M. was

documenting proof that Judge Gannon used his judicial powers to defraud insurance companies.

---

[20] Newman v. Van Wingerden Associates LLC, No. SSX-L-263-11.

82.     J.L.D. did not go to work November 19, 2014 or November 20, 2014.   On the morning

of Wednesday, November 19, 2014, J.L.D. informed Henderson he was going to "work from home

today" but would use a "sick day" if necessary. Later that day J.L.D received a text from L.H. that Judge Gannon was at the courthouse and was "annoyed" he wasn't there.

83.    Informing a judge's secretary is the appropriate method of calling out sick. In addition, Judge Gannon had relieved himself off his judicial and administrative duties that week by requesting off.

84.    J.L.D. sent L.H. the following text message that night:
"I hope this message doesn't wake u. I won't be in again today. I am dealing with a fairly serious personal situation. I was disappointed to hear judge was annoyed. If judge is concerned about things getting done you may (but its fine if you don't) tell him that I have been working hard, we r in good shape with everything coming up and all the backlog I was left with is out as well. I currently have 13 sick days remaining. I won't be answering phone today. I will be in tomorrow."

85.    Based on information and belief Judge Gannon was shown this text message.

### November 20, 2014 Phone Conversation

86.    On November 20, 2014 Judge Gannon called J.L.D. The following was said in this conversation (this is not intended to be complete recital of conversation):

        a)    J.L.D. said he was upset because he felt he was being taking advantage of; J.L.D. asked Judge Gannon to work more as a team; he said he "felt like he didn't get a lot of help."

        b)    Clarified to Judge Gannon at least twice he didn't feel this way because of the work load, and that he enjoyed his judicial work, but he didn't like the work "environment" and felt he was being "disrespected." Judge Gannon responded by asking "who is disrespecting you?" J.L.D. responded to this by saying "we need to talk in person."

        c)    Several times Judge Gannon said he didn't like J.L.D.'s attitude.

        d)    Judge Gannon advised J.L.D. that he owed a debt of gratitude to Judge Gannon.

        e)    Judge Gannon reminded J.L.D. that he wouldn't be back in the office until December 1st and was worried about J.L.D. quitting. The conversation ending with J.L.D. saying they would talk next time Judge Gannon was in chambers (December 1, 2014) so they could "iron things out" and "layout some rules so we are on the same page."

### 1st Retaliatory Act: November 21st 2014

87.    As planned, on Friday November 21, 2014 J.L.D. went to work; Judge Gannon did not.

88.    On November 21, 2014, J.L.D found his work phone unable to receive incoming calls. P.W. received J.L.D.'s incoming calls and transferred necessary calls to J.LD.  I.T. was not called about the phone; it was presumed that this arrangement occurred at Judge Gannon's instruction.  The arrangement took place until November 26, 2014.  The courts were closed November 27, 2014 to November 30, 2014. On December 1, 2014 J.L.D. returned to work to find his phone functioning as normal.  J.L.D never received an explanation for the reason his phone was disabled.

### December 1st 2014 Meeting

89.    The next time J.L.D. and Judge Gannon were in the office together after the November 20, 2014 conversation was Monday December 1, 2014.  Upon arriving to work J.L.D. entered Judge Gannon's office and asked to speak to him.

90.    In this conversation the following was said (this is not intended to be complete recital of conversation):

a)    J.L.D. complained about finding his phone disabled on November 21, 2014. J.L.D. specifically told Judge Gannon, "that he didn't like that [Judge Gannon] had disabled his phone." Judge Gannon responded by saying he didn't appreciate J.L.D. "copping[21] and attitude with him" in their November 20, 2014 phone conversation and suggested he was being "oppositional."

b)    J.L.D. told Judge Gannon his approach to his judicial and administrative duties "killed his motivation." He asked Judge Gannon to work more as a "team" and that said "everyone needs to do their jobs."

c)    J.L.D. said he thought Judge Gannon at the very least should his read his statement of reasons and/or write ups.  Judge Gannon responded by saying if there was a problem with J.L.D.'s writing he would let him know, He told J.L.D. he had a good work product.

---

[21] Slang term. *Verb*. Meaning to receive.

d)      J.L.D. told Judge Gannon that he didn't like doing his personal tasks and that he had a "full plate" with all of his responsibilities at work, to the point he didn't think he was capable of doing his personal tasks and performing his judicial responsibilities effectively. Judge Gannon responded by saying "I told you in your interview you would be responsible for completing other tasks besides clerkship work."

e)      At least twice in the conversation, Judge Gannon brought up complaining to HR in Morristown and Judge Weisenbeck. J.L.D. told Judge Gannon he "he did not want to do that" because he valued the confidentiality and closeness of the judge/law clerk relationship and that they should be able to work out problems amongst themselves.

g)      Judge Gannon told J.L.D. in this conversation that J.L.D. had "poisoned the well." J.L.D. responded that "he was just telling him how he felt and thought we could improve our relationship and workplace efficiency."

h)      J.L.D. told Judge Gannon that he was not going to quit, "no matter how bad things got" because "he wasn't a quitter." He told Judge Gannon that "he knew [Judge Gannon] was the boss" and that he would "go outside and shovel snow" if Judge Gannon asked him to.

i)      The conversation ended in a hand shake.

### Attempted Retaliatory Act

91.     Paychecks for judicial employees are issued bi-weekly. Based on information and belief, L.H. was issued a paycheck on November 21, 2014 and another one on December 5, 2014.

92.     On or around December 4, 2014 Judge Gannon sent J.L.D. to pick up L.H.'s November 21, 2014 paycheck at the New Courthouse. L.H. had left early that day and was not in the office at this time. J.L.D. had never previously been asked to pick up anyone's paycheck.

93.     Based on information and belief Henderson was at work and capable of picking up her paycheck on November 21, 2014; November 24, 2014; November 25, 2014; December 1, 2014; December 2, 2014; December 3, 2014 and December 4, 2014.

23

94.     When picking up a paycheck it is policy for the employee to sign their name to indicate they are receiving their paycheck.

95.     Based on information and belief Judge Gannon intended to have J.L.D. forge L.H.'s signature.

### December 5, 2014 – Day of Fabricated Incident (3rd Retaliatory Act)

100.     Shortly after Judge Gannon left, J.L.D. began to feel dizzy from the stress caused by Judge Gannon's conduct during oral arguments.  J.L.D. went to sit in his car to close his eyes for five minutes in order to relax.  While walking out he saw Juarbe-Aponte the civil team leader.  He told Juarbe-Aponte he didn't feel well and would be right back. J.L.D. sat in his car for about five minutes.  Judge Gannon's car was not in the parking lot at this time.

101.    J.L.D. returned to chambers and helped Juarbe-Aponte out with a question. He told Juarbe-Aponte this was a tough motion week; he was worn out; and that he would help her more Monday. Juarbe-Aponte and J.L.D. made small talk about Christmas plans. Juarbe-Aponte told J.L.D. if he ever needed any help to let him know. Juarbe-Aponte then left. Laura Henderson was present for this conversation.

102.    Judge Gannon was scheduled to hear a Summary Judgment motion for the "Falcon Ridge Case" at 1:30 pm. Judge Gannon had not looked the file which was relatively speaking, quite large.

103.    About ten minutes after Juarbe-Aponte left, J.L.D. began to feel anxious about sitting through the motion hearing. J.L.D. stood up got some water and then stood over his desk for a few minutes, at times stretching. J.L.D. picked up the "Falcon Ridge" file and put it on Judge Gannon's bench for the 1:30 pm. hearing. J.L.D. went back into chambers, stood over his desk again for a few minutes. At this time L.H. was at her desk which is located about ten feet from J.L.D.'s desk. For the few minutes J.L.D. stood over his desk neither him nor H██████ spoke. J.L.D. then told H█████ that he had to go home because he felt dizzy and that he left the "Falcon Ridge" file for the 1:30 pm motion hearing on the bench. He also said: "I'm sorry, I know the Judge is probably going to be pissed but I just really need to get out of here right now, I just don't feel well."

104.    J.L.D. walked outside to his car and drove home. Judge Gannon's car was not in courthouse at this time.

105.    In no way, shape or form, did J.L.D.'s body language, tone, conduct, etc. suggest he was angry, or give anyone the slightest impression that he had "thrown something;" "stormed out;" was quitting, or even dissatisfied with his positon or Judge Gannon.

106.    On December 6, 2014, J.L.D. received a text message, followed by a phone call from B.G. (another Sussex County law clerk) saying she had heard that on Friday that J.L.D. had "thrown something" and "stormed out" and wanted to make sure everything was okay. She said she was under the impression J.L.D. was "done for good." She said this story was told to numerous people, and that Judge Gannon had come over to the New Courthouse to tell people this story. Those that heard the story

25

included, but are likely not limited to: Sussex County Judges, Sussex court staff and outside attorneys not employed with the New Jersey Judiciary, including C.O. who currently practices in Jersey City, and B.L. who currently practices in Newton, NJ.

107.    No one contacted J.L.D. after he left on Friday December 5, 2014.

108.    Prior to the November 20, 2014 conversation neither Judge Gannon nor L.H. had ever commented negatively on J.L.D's behavior at work to J.L.D.  J.L.D. never received any sort of formal discipline or warning.

## Monday, December 8, 2014

109.    J.L.D was scheduled to "mediate" with B.G. on Monday December 8, 2014 in the New Courthouse.  J.L.D. on the night of December 7, 2014 contacted B.G..  He asked her to inform Juarbe-Aponte that he was going to work from home the following day to "suggest a plan to improve work place efficiency and environment." J.L.D. told B.G. he was not going to inform Judge Gannon or L.H. he was missing work because he "didn't want to be harassed."

110.    On December 8, 2014 around 11:00 am J.L.D. received a voice mail from Susan Chait, Human Resources Director for the Morris/Sussex Vicinage saying that it was reported he left work early on Friday and didn't come in on Monday.

111.    On December 8, 2014, around 2:00 pm in the afternoon J.L.D's father ("Dad") showed up to J.L.D's apartment door.  Dad said that Judge Gannon had called him and told him that J.L.D. didn't show up to work today ( December 8, 2014) and "stormed out" and "thrown something" on Friday

114.     Around 2:30 pm J.L.D. called Judge Gannon's cell phone and left a voicemail asking to know why he was telling people this fabricated story. He said on the voicemail that the whole situation was very "disturbing." Judge Gannon did not respond. Around 4:11 pm J.L.D. received a text message from Laura Henderson telling J.L.D. to be at the Morristown Courthouse at 9:00 am because Judge Gannon was assigned to a trial there on December 9, 2014 and December 10, 2014. This was the first time during J.L.D.'s clerkship that Judge Gannon had been stationed anywhere but the Historic Courthouse in Newton, NJ.

115.     J.L.D. called Human Resources manager Susan Chait around 3:00 pm. J.L.D. told Chait that he felt Judge Gannon engaged in gross judicial and administrative misconduct without giving any details. Chait recommended J.L.D. to the Employee Assistance Program and said reassignment to another judge would likely not be possible. Chait followed up with an e-mail providing J.L.D. with information regarding the Employee Assistance Program.

### December 9, 2014 Meeting (4th Retaliatory Act)

117.     J.L.D. met with Judge Gannon the morning of December 9, 2014 in Morristown. The following was said in this conversation (note: this is not intended to be complete recital of conversation)

    a)     J.L.D. told Judge Gannon he had no right to call his father and wanted to know why he was telling people a fabricated story about him. Judge Gannon responded by saying he had a written statement from L.H. saying that he had "thrown a water bottle." (Note: Judge Gannon did not specify water bottle to J.L.D.'s father or others). J.L.D responded by telling him "that was a lie" and asked to speak with Henderson in front of him. Judge Gannon denied this request.

e)      Judge Gannon told J.L.D. that he had his keycard disabled and the process of his termination was underway with HR.

f)      Judge Gannon told J.L.D. that he had two options: sign up for treatment to deal with his "behavior/mental health problems" or be terminated. When asked, Judge Gannon said reassignment was no longer possible. J.L.D. asked Judge Gannon for a day to talk to his family and friends about this. Judge Gannon responded that his family and friends did not know what was best for him. Eventually Judge Gannon agreed to give J.L.D. a day to think things over after J.L.D. told Judge Gannon he felt like he was trying to "bully" him into a decision.

118.    Immediately after this meeting J.L.D. called Chait who told him he could be "reassigned" to any division he wanted.

119.    Shortly after, Chait and J.L.D. had another phone conversation: Chait told J.L.D. he had been reassigned to the then Presiding Civil Division Judge, Rosemary E. Ramsay, and he should be at her chambers tomorrow at 8:30 am. She also said that Judge Gannon would be informed of the reassignment.

120.    J.L.D. was never given an opportunity to collect his things in Judge Gannon's chambers. No one ever offered to pick up his things.

### Post – Reassignment (December 10, 2014)

121.    On December 10, 2014 J.L.D. arrived to Judge Ramsay's chambers at 8:30 am. Judge Ramsay's current law clerk Alexandra Robertson walked J.L.D. to the chambers of the other judges so he could be re-introduced to the other Morris County law clerks. Around 9:00 am J.L.D. saw Judge Gannon

and Judge Ironson. For the second consecutive day, Judge Gannon was stationed in Judge Ironson's chambers. Upon seeing J.L.D. Judge Gannon told J.L.D. to come into his office and he closed the door. Judge Gannon initiated the conversation by asking J.L.D. if he had come to a "decision" regarding his ultimatum. J.L.D. responded by telling him he didn't think he was the source of the problem and had been re-assigned to Judge Ramsay. To J.L.D's surprise Judge Gannon was not aware of the reassignment. Judge Gannon demanded to know who had reassigned him. J.L.D. said he didn't feel comfortable being the one to tell him about the reassignment, Judge Gannon then said he changed his mind about listening to J.L.D.'s request to make changes in chambers and was willing to accommodate J.L.D's requests. J.L.D. got up and left the office saying multiple times "sorry Judge I feel very uncomfortable."

123.     Around 11:00 am on December 10, 2014, J.L.D. met with Assignment Judge Weisenbeck, Susan Chaitt, Judge Ramsay, and Rashad Shabaka-Burns, Trial Court Administrator for the Morris/Sussex Vicinage. When J.L.D. said that the biggest issue with Judge Gannon was that "he didn't want to do any work," Judge Weisenbeck responded by saying "I know." When J.L.D. said he was concerned because Judge Gannon had tarnishing his name and reputation with a fabricated story, Judge Weisnebeck responded by suggesting that everyone knew that Judge Gannon was not a credible source.

## V. RELIEF SOUGHT

### NOTICE PREREQUISITE FULLFILLED

131.    On December 16, 2014 Meryl G. Nadler, Esq., acknowledged J.L.D's intention to file a civil action based on the factual allegation described herein. (Ex. E) The letter denied Plaintiff's request to engage in settlement discussions.

132.    On December 26, 2014, Plaintiff sent via certified mail, notice of this Complaint to the Tort and Contract Unit Department of the Treasury Bureau of Risk Mgmt., PO Box 620 Trenton, New Jersey 08625.

### COUNT I

#### (Against Judge Gannon and the New Jersey Judiciary)

### RETALIATION FOR EXERCISING FIRST AMENDMENT RIGHTS, 42 U.C.S § 1983

133.    Plaintiff incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

134.    At all times relevant to Count I, Judge Gannon acted under the color of state law as an administrator and supervisor to J.L.D.  At no time relevant to Count I was Judge Gannon acting within his judicial capacity.

30

135.   The Supreme Court has ruled that a public employee's speech involving matters of public concern constitutes protected speech under the First Amendment.

136.   On November 20, 2014, and December 1, 2014, Plaintiff spoke to Judge Gannon about a matter that concerns the public - Judge Gannon's approach to his judicial and administrative duties.

137.   Plaintiff engaged Judge Gannon in a manner that was efficient and non-disruptive by respectfully expressing his concerns to Judge Gannon in private.  Plaintiff told Judge Gannon he was not going to quit, not going to go to Human Resources or the Assignment Judge, and would continue to do whatever he asked of him.  Plaintiff did not argue with Judge Gannon's responses and did not attempt to force change by any means.

138.   On December 5, 2014 Plaintiff engaged in a protected act under the First Amendment by not participating in the 1:30 pm "Falcon Ridge" motion hearing.  Plaintiff left the Courthouse without causing any disturbance what so ever.  Plaintiff did not criticize Judge Gannon in any way to anyone before his departure.

139.   In response to Plaintiff's protected speech, Judge Gannon immediately committed retaliatory acts against the Plaintiff in order to diminish his credibility out of fear that Plaintiff was going to report his misconduct.

140.   Prior to Plaintiff rebuffing Judge Gannon's blatant judicial and administrative misconduct, Plaintiff and Judge Gannon had a good relationship; J.L.D. never received any form of discipline.  Judge Gannon told J.L.D he "was a good law clerk."

141.   If Plaintiff never showed any disapproval for Judge Gannon's actions, none of the retaliatory events would have occurred.

<u>Count II</u>

(Against Judge Gannon and the New Jersey Judiciary)

DEPRIVATION OF DUE PROCESS RIGHTS, 42 U.C.S § 1983

142.   Plaintiff incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

143.    At all times relevant to Count II, Judge Gannon acted under the color of state law as an administrator and supervisor to J.L.D.  At no time relevant to Count II was Judge Gannon acting within his judicial capacity.

144.    On December 5, 2014 Plaintiff left the courthouse early.

145.    No one contacted Plaintiff on December 5, 2014 to find out why he left work.  No one contacted Plaintiff on December 6th or 7th.

146.    J.L.D. called Judge Gannon on December 8th and left a message.  Judge Gannon did not call him back.

147.    At no point did Judge Gannon ever ask Plaintiff why he left work early, if he had been to a doctor, or why J.L.D. believed the story that he "threw something" and "stormed out" was completely fabricated.

148.    Plaintiff had never done anything in chambers to even remotely suggest that Plaintiff was capable of extreme impulsivity, violence, or rage.

149.    Judge Gannon refused to allow Plaintiff to speak to H██████ in front of him.

150.    As a consequence for the fabricated event Plaintiff was told he was "technically" terminated; his keycard disabled; in addition his reputation had been ruined; and he received the ultimatum of receiving mental/health treatment or being "officially" terminated.

151.    Upon reassignment the New Jersey Judiciary informed Plaintiff he was required to keep the matter "confidential."  Consequently, Plaintiff was never able to defend his good name within his place of employment or members of the New Jersey Bar.

## Count III

### (All Defendants)

**NEW JERSEY CONSCIENTIOUS EMPLOYEE PROTECTION ACT, N.J.S.A. § 34: 1 9-1 et seq.**

152.    Plaintiff incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

32

153.    Plaintiff is an "employee" for purposes of N.J.S.A. § 34: 1 9-1 et seq., because at all times relevant hereto, he performed services for and under the control and direction of an employer for wages or other remuneration.

154.    Plaintiff was never made aware of any "whistleblower" procedures.  At all times herein, there was no "Whistleblower Act" notice displayed in Judge Gannon's chambers.  The New Jersey Judiciary had previous acknowledged as their policy to display notice of the "Whistblower Act" at all times as well as give employees notice once a year.  See Judge Grant's September 25, 2009 memorandum (**Ex. G**) which states: "This notice must be conspicuously displayed;" and "Once each year, every Judiciary unit must distribute notice of this law to all employees."

155.    Plaintiff on various occasions attempted to encourage Judge Gannon to become more involved in the judicial process.  On November 10, 2014 he criticized his administrative misconduct regarding L.M.  On November 20, 2014 and then in more detail on December 1, 2014 Plaintiff confronted Judge Gannon about what he felt was an improper use of administrative and judicial conduct.

156.    Judge Gannon responded negatively to J.L.D.'s complaints by telling him he "had poisoned the well;" and he "should go to HR and get assigned."

157.    Motions were heard on December 5, 2014.  Judge Gannon committed several acts of judicial misconduct.

158.    Plaintiff left the Courthouse early on December 5, 2014; subsequently Plaintiff suffered four adverse employment actions:

    a)      His future employment opportunities and professional reputation was destroyed by Judge Gannon's fabricated December 5, 2014 story.

    b)      Judge Gannon told J.L.D. he had "technically" been terminated, his keycard disabled, and as a condition of employment he required J.L.D. to receive mental health/behavior treatment for a fabricated act.

    c)       Plaintiff was reassigned to Judge Ramsay and prohibited from explaining the events that lead to the reassignment.  Accordingly, it is presumed Plaintiff's reassignment was the result of his personal and professional shortcomings, not Judge Gannon's.

    d)       On February 10, 2014 J.L.D. was terminated.

<u>Count IV</u>

(Against the New Jersey Judiciary, Lout Taranto and John Tonelli, or in the alternative, against the New Jersey Judiciary, Thomas L. Weisenbeck, and Rosemary E. Ramsay)

VIOLATION OF DUE PROCESS RIGHTS BY BEING DELIBERATELY INDIFFERENT TO A "STATE CREATED DANGER" 42 U.C.S § 1983, OR  IN THE ALTERNATIVE, NEGLIGENT SUPERVISION § 213 OF THE RESTATMENT (SECOND) OF AGENCY

<u>Count V</u>

(All Defendants)

DEFAMTION, OR IN THE ALTERNATIVE, FALSE LIGHT

171.    Plaintiff incorporate by reference all preceding paragraphs of this Complaint as if fully set forth herein.

172.    By 4:30 pm on December 5, 2014, Judge Gannon and potentially L█████ H████████[22] told third parties within Plaintiff's professional field, a detailed story about Plaintiff which was fabricated. The story made the Plaintiff seem violent, out of control, and mental and emotionally unstable.

173.    As a result of this story Plaintiff's reputation as a lawyer is permanently destroyed in New Jersey.  Not only have his potential employment opportunities been eliminated; but his future success as an attorney will forever be limited with a reputation of violence, and angry outbursts in the workplace.

---

[22] Acting under the control and influence of Judge Gannon.

174.    On December 8, 2014 Judge Gannon inappropriately called Plaintiff's father. During this phone call Judge Gannon explicitly repeated the December 5, 2014 story in the same manner, which attacked Plaintiff's character and mental stability.

175.    The relationship between Plaintiff's father and Plaintiff has had issues which based on information and belief Judge Gannon was aware of. Plaintiff's father told Plaintiff to work for Judge Gannon and questioned Plaintiff's character.

176.    Judge Gannon told Plaintiff on December 9, 2014 he was "violent;" a "threat to others and himself;" and needed treatment for mental health issues. Based on information and belief, this is the image that Judge Gannon attempted to portray of Plaintiff with his December 5, 2014 fabrication.

### Count VI

### (As to all Parties)

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRIESS, OR IN THE ALTERNATIVE NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

177.    Plaintiff incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

178.    Judge Gannon regularly made derogatory remarks and acted immorally toward Plaintiff; including asking Plaintiff if he had been molested as a boy

179.    Judge Gannon used Plaintiff's past and his family to make him perform illegal activity. Upon Plaintiff showing resistance he as has been repeatedly retaliated against.

180.    Based on information and belief, Judge Gannon hired Plaintiff solely because he believed Plaintiff would not report him. Based on information and belief Judge Gannon had knowledge that Plaintiff was bullied throughout high school and his relationship with his father was challenging. As evidence of this, Judge Gannon resorted to calling Plaintiff's father in order to protect himself.

181.    Plaintiff has spent years overcoming abusive treatment from his parents, and severe bullying throughout high school. The allegations referenced herein have reopened old wounds which had

previously healed. Plaintiff now experiences fear for his safety, anxiety which is especially strong in the workplace, inability to sleep, introversion, lack of trust in others, damaged relationships, self-esteem issues, stomach pains, headaches, tinnitus and muscle spasms.

## VI. RELIEF SOUGHT

182.   **Requests punitive damages** as to all counts and all parties.

183.   Requests compensatory damages for pain and suffering as to all counts.

184.   Requests actual damages for associated medical costs.

185.   Requests compensatory damages for time and money invested in graduating law school, passing both bar exams, obtaining a clerkship position, and endured numerous acts of abuse by Judge Gannon all for the sole purpose of securing a prosperous legal career.

186.   Requests compensatory damages for damage to reputation or in the alternative sufficient injunctive relief.

187.   Requests the maximum civil fine under The New Jersey Conscious Employee Act which is $10,000 for a first time offense; and $20,000 for each subsequent offense.

188.   Reimbursement for sick days/vacation days used after December 5, 2014.

189.   Requests attorney fees in the event that plaintiff later chooses to retain counsel.

190.   For such other and further relief as the Court deems just and proper.

### Request to Seek Trial Counsel

Plaintiff wishes to reserve the right to seek trial counsel if parties fail to settle this matter prior to trial.

38

## VII. <u>REQUEST FOR CRIMINAL CHARGES</u>

(As to Edward V. Gannon, Lou Taranto, John Tonelli, Shareholders of Dempsey Dempsey,

Shareholders of Dorsey Semrau, Sheehan, Shareholders of Laddy Clark and Ryan,

Judge Glenn A. Grant)

### CIVIL/CRIMINAL CONSPIRACY TO COMMIT INSURANCE FRAUD AND ABUSE

191.    Plaintiff incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

192.    Plaintiff alleges the existence of a conspiracy amongst a group of families in New Jersey, specifically located in Morris County, Bergan County, and Monmouth County (hereinafter "NJ Conspiracy") (See Ex. G). This conspiracy allows for a substantial amount of insurance fraud to be accomplished and is performed by these "connected" families employing professionals in several different fields in New Jersey.

193.    The Conspiracy is made possible by New Jersey state court corruption and cyber security privacy invasion.

194.    Based on information and belief in order to maintain the NJ Conspiracy, parents force their offspring to participate in their fraudulent schemes, as well as employ tactics of abuse and manipulation to those that threaten the conspiracy. Based on information and belief, typically, when one of the offspring becomes a threat to the conspiracy, the parents and professional network of the offspring retaliate in mentally abusive ways, in order to make the offspring's mental health an issue. Consequently, mental health professionals within the conspiracy can diagnose the child as "psychotic" or some similar condition.

### Evidence of Conspiracy

195.    Despite the economy, the waste management industry and certain law firms (Laddy Clark and Ryan) have experienced a substantial amount of growth. Action Carting Environmental has experienced an enormous and rapid increase in revenue and growth. Based on information and belief, Action Carting; Ace Waste Services; Interstate Waste Services; Action Caring; SLM Waste & Recycling

39