# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| J.L.D.,<br><br>                Plaintiff,<br><br>        v.<br><br>ESTATE OF EDWARD V. GANNON,<br>THE NEW JERSEY JUDICIARY,<br>STATE OF NEW JERSEY,<br>DORSEY SAMARU LLC,<br>LOUIS TARANTO, and<br>JOHN A. TONELLI,<br><br>                Defendants. | Civ. No. 15-386  (KM)<br><br>**OPINION** |

**KEVIN MCNULTY, U.S.D.J.:**

J.L.D. brings this action *pro se* alleging violations of his First Amendment rights and right to due process, pursuant to 42 U.S.C. § 1983 ("Section 1983"), as well as state law claims for violation of the CEPA whistleblower statute, defamation, and infliction of emotional distress. The events related in the complaint arise from JLD's employment as a law clerk to the late Edward V. Gannon, a judge of the Superior Court of New Jersey.[1] JLD sues the judge, the State of New Jersey, the State Judiciary, two members of the Advisory Committee on Judicial Conduct, and a law firm which is alleged to have played some role in the application process for the clerkship.

---

[1]     Judge Gannon died suddenly on February 16, 2016, while this action was pending. (ECF no. 51) Pursuant to Fed. R. Civ. P. 25, the Estate of Edward V. Gannon has been substituted as defendant. (ECF no. 64) For simplicity, the defendant will be referred to herein as Gannon.

The motion of Judge Gannon to dismiss the case (ECF no. 36), fully briefed and pending at the time of his death, was administratively terminated. Gannon's counsel, now counsel for the estate, has asked that the motion be restored to the calendar (ECF no. 66), and seeks leave to join in the motion to dismiss filed by the State Defendants (ECF no. 67), requests which I will grant.

1

The complaint attacks the conduct and character of a judge, now deceased and unable to defend himself. Counsel for the Estate of Judge Gannon, while acknowledging the standard on a motion to dismiss, stresses that the veracity of those allegations is vehemently disputed. Under the circumstances, it bears repeating that a motion to dismiss must, as a matter of law, assume the allegations to be true and determine whether, *if* true, they would state a legal claim. *Whether* they are true is an issue for another day. The allegations of this complaint consist in part of matters personally observed, mixed with more general grievances, personal opinions, tenuous inferences, allegations "on information and belief" that massive fraud was occurring, and conspiracy theories. I must, however, spare some sympathy for the plaintiff as well. The complaint paints a portrait of an idealistic recent law school graduate, beset by personal and professional issues and disappointments. In short, the situation is highly regrettable for everyone involved, and is perhaps not very amenable to resolution by litigation.

My task, however, is not to untangle this complex state of affairs. It is to determine whether this *pro se* complaint alleges viable causes of action against the defendants. In many respects, it does not. As to Judge Gannon, however, the allegations do state certain legal claims.

For the reasons stated herein, the motion to dismiss the complaint filed on behalf of Judge Gannon (ECF no. 32) is granted in part and denied in part. The motions to dismiss filed by the remaining defendants (ECF nos. 42, 50) are granted.

## I.   BACKGROUND

The relevant background consists of the allegations of the Second Amended Complaint ("2AC", ECF no. 32) For purposes of these motions to dismiss only, those allegations must be assumed to be true. *See* Section II, *infra.* Although I summarize them here, not all are directly relevant to the causes of action that are pled.

The plaintiff, JLD, is a 2014 law school graduate, not yet admitted to the bar. (*See* ECF no. 53) Defendant Edward V. Gannon was a judge of the Superior Court of New Jersey, Law Division, Morris/Sussex Vicinage. Judge Gannon's chambers were located in the Historic Courthouse in Newton, NJ. (2AC ¶¶ 1, 2, 11. For the remainder of Section I, the 2AC is cited by paragraph number only.) Also named as defendants are the State of New Jersey, the New Jersey Judiciary, and Lou Taranto and John Tonelli, who are members of the Advisory Committee on Judicial Conduct (together, the "State Defendants"). Defendant Dorsey & Semrau, LLC (the "Dorsey firm") is a law firm.[2] JLD interviewed with Judge Gannon and, in July 2014, accepted a position as a law clerk for the 2014–15 term. (¶ 9)

Judge Gannon is alleged to have a "history of idiosyncratic behavior." In 2008 he allegedly wrote a letter critical of the Passaic County Assignment Judge. (¶ 22(a)) In 2013 he rejected a plea deal, resulting in Assignment Judge Tom Weisenbeck's transfer of the case to another judge. (¶¶ 22(b),(c)) In 2009 he declined to participate in state worker furloughs. (¶ 22(d)) In 2012 he declared New Jersey to be the insurance fraud capital of the world. (¶ 22(e))

Judge Gannon, "on information and belief" allegedly abused recent law clerks. One said he did housework for Gannon, who made disparaging remarks about his Indian girlfriend. Others had similar complaints about the quality of the work environment and demands that they do personal errands and tasks for the judge. (¶ 23)

---

[2]    The Dorsey firm states, and JLD acknowledges, that the name of the firm is incorrectly rendered in the caption.

JLD's clerkship began on August 25, 2014. In late August JLD was asked to type up a list of the judge's personal medications. (¶ 24) In September, learning that JLD wished to move out of his parents' home, the judge suggested that he move in with him and pay $600 per month rent. (¶ 25) On two occasions, Judge Gannon left chambers and returned looking intoxicated. (¶ 26) On information and belief, Judge Gannon acted to impair JLD's productivity as part of a plan to divert him from discovering that "many of Judge Gannon's cases were part of a fraudulent scheme." (¶ 27)

JLD alleges that he was asked to spend a substantial amount of time doing Judge Gannon's personal tasks, such as typing up personal letters, running errands, and the like. (¶ 28) He was witness to "disturbing remarks" by Judge Gannon. These included a statement that Gannon and former New Jersey Senator John H. Dorsey "'made a lot of money' from insurance companies together"; a reference to a boy scout leader who allegedly molested boys during a time period that would have encompassed JLD's childhood years; a statement that Judge Gannon refused to sign emergent warrants in order to discourage police from applying for them; accusations of misconduct against other judges; a statement that a local attorney fraudulently reported capital gains; a claim that a former law clerk was institutionalized and could not handle the practice of law; and unspecified derogatory remarks about minorities, the mentally handicapped , and women. (¶ 30)

JLD's predecessor, EH, trained him to signature-stamp orders on motions, leaving the signature page on top so the judge "doesn't have to go through it." (¶ 31) Attorneys allegedly requested specially that Judge Gannon hear their cases either in hopes of favoritism or because the case involved a "fraudulent scheme Judge Gannon had been made privy to[]." (¶ 32) In many cases, the judge spent so little time with the file that he could not have read it. (*See* ¶¶ 33–37) The handling of motions was disorganized, a situation JLD attempted to remedy with a color coding system. (¶¶ 38–41) As to the research

or drafting of statements of reasons, Gannon would completely defer, either to JLD or to attorneys for the parties.[3] (¶¶ 41–42)

On three occasions, Judge Gannon gave favorable treatment to cases involving an attorney with whom he was friendly, Phillip C. Wiskow.[4] In one, JLD had drafted a statement of reasons adverse to Wiskow's client, but Judge Gannon decided the case the other way. In another, in November 2014, JLD believed that Wiskow got more favorable treatment on evidentiary rulings. In a third, on December 5, 2014, JLD drafted a partial statement of reasons adverse to the position of Wiskow's client, but Judge Gannon decided the matter the other way, using "questionable reasoning." (¶46) Judge Gannon engaged in ex parte communications, including telling a former law clerk (an attorney in "the Walmart case") that the opposing attorney had good arguments. This was allegedly a sham, intended to divert JLD's suspicions in some way. (¶¶ 48–49)

On December 1, 2014, JLD drafted statement of reasons, and Judge Gannon signed the order without looking at the file. He later asked about it, not remembering he had signed it already. (¶ 50)

The 2AC alleges that Judge Gannon hired staff based on connections, and, "on information and belief," because he believed they would not report fraudulent activity or judicial misconduct. (¶ 51–52) At JLD's own interview, on June 20, 2014, Judge Gannon did not ask for any supporting documentation, but JLD did tell the judge that JLD's father and the judge's brother had coached CYO basketball together. (¶¶ 53–55)

Judge Gannon was allegedly an old associate of former New Jersey Senator John H. Dorsey, a named partner of the defendant Dorsey firm.[5] The

---

[3]    The name of one such Sussex County attorney is rendered as "McCnulty." To remove doubt, no family relation of mine fits the description.

[4]    Elsewhere in the complaint, the name is spelled "Wiscow." From consulting the online Roll of Attorneys, I believe "Wiskow" is correct and I will consistently render it that way, even in quotations.

[5]    JLD alleges that "Judge Gannon told J.L.D. that Dorsey appointed him to the bench at the age of 39, and they made money together off insurance scams." This appears to be JLD's extrapolation from what he heard, though it is drafted to obscure

firm also employs Joe Bock, Esq. (¶¶ 56–57) Several hours after JLD's interview with Judge Gannon, Bock called and invited JLD to apply for a position with the firm. He asked JLD about his living arrangements and student loans, allegedly because the firm seeks employees who are dependent and therefore tractable. (¶ 59) On June 27, 2014, Judge Gannon interviewed JLD again. Later, Bock informed JLD that he heard from his partner, Mr. Semrau, that the judge was going to hire him. On July 2, 2014, Judge Gannon offered JLD the clerkship position, which he accepted. (¶¶ 61–63)

On November 10, 2014, Judge Gannon had JLD give LM, who was present at trial, a business card with a note asking her to see him in chambers after trial. He had JLD look up LM on Facebook. The ostensible motive was sexual, but the sexual motive is portrayed as a mere pretext for something else: JLD "on information and belief" alleges that Judge Gannon feared that LM "was documenting proof that Judge Gannon used his judicial powers to defraud insurance companies." (¶ 65) Immediately thereafter, Judge Gannon interrogated JLD about his finances, his family, his girlfriend, and other matters. (¶ 67)

On November 15, 2014, Judge Gannon went to the emergency room because of a horseback riding accident. A few days later the judge said he was happy about having been prescribed oxycodone. JLD took off from work on November 19, 2014, believing that the Judge, too, would be out sick. He learned, however, that Judge Gannon had come in to work and was annoyed at

---

that. Earlier in the complaint, the actual quotation is rendered thus: "Judge Gannon said that he and former New Jersey Senator John H. Dorsey 'made a lot of money' from insurance companies together." (¶ 30(a)). *See also* ECF no. 48 at 4–5 (JLD's request that court accept as admission of party opponent the statement of Judge Gannon that he and Dorsey "made a lot of money from insurance companies together.")

In his brief, JLD frankly acknowledges that he is *presuming* fraud: "Judge Gannon told J.L.D. that John H. Dorsey (of Dorsey Samaru LLC) got him appointed to the bench and 'they made a lot of money from insurance companies together;' this can be presumed as an admission of insurance fraud." (ECF no. 40 at 6) A lawyer's statement that he and another lawyer had made a lot of money from insurers is not an "admission of insurance fraud."

his absence. (¶¶ 68–73) That night, JLD texted the judge's secretary that he would be taking a sick day on November 20, 2014. (¶ 74)

**November 20 complaint**. On November 20, 2014, Judge Gannon and JLD had a phone conversation in which JLD said he felt "taken advantage of" and was not getting a lot of help; that he liked the work but not the work environment; that he "wasn't blind to the facts," by which he meant to refer to Judge Gannon's "obvious judicial and administrative misconduct"; and that he wanted to talk in person about these issues. Judge Gannon replied that JLD owed him a debt of gratitude; said he wouldn't be back in the office until December 1, 2014; and said he was worried about JLD quitting. (¶ 76)[6]

On November 21, 2014, JLD's work phone would not receive incoming calls. Someone else had to receive the calls and transfer them to JLD. JLD "presumed" this occurred at Judge Gannon's direction. After the Thanksgiving holiday, on December 1, 2014, JLD returned to find his phone working again. (¶ 78)

**December 1 complaint**. On December 1, 2014, JLD and Judge Gannon had a face-to-face conversation. JLD said Judge Gannon's approach was killing

---

[6]     Because the content of this conversation is critical to JLD's First Amendment claim, I quote the allegations in full:

76. On November 20, 2014 Judge Gannon called J.L.D. The following was said in this conversation (this is not intended to be complete recital of conversation):
a) J.L.D. said he was upset because he felt he was being taking advantage of; J.L.D. asked Judge Gannon to work more as a team in order for the judicial process to be performed properly; he said he "felt like he didn't get a lot of help."
b) Clarified to Judge Gannon at least twice he didn't feel this way because of the work load, and that he enjoyed his judicial work, but he didn't like the work "environment" and felt he was being "disrespected."
c) J.L.D told Judge Gannon "he wasn't blind to the facts" in reference to Judge Gannon's obvious judicial and administrative misconduct.
d) J.L.D. told Judge Gannon he wanted "to talk in person" about these issues.
e) Judge Gannon advised J.L.D. that he owed a debt of gratitude to Judge Gannon; and said he didn't like J.L.D's attitude
f) Judge Gannon reminded J.L.D. that he wouldn't be back in the office until December 1st and was worried about J.L.D. quitting. The conversation ending with J.L.D. saying they would talk next time Judge Gannon was in chambers (December 1, 2014) so they could "iron things out" and "layout some rules so we are on the same page."

his motivation. He asked the judge to read his draft statements of reasons. He stated that he could not both perform Judge Gannon's personal tasks and do his job properly. Judge Gannon said he did not like JDL's attitude or oppositional stance. He said JDL produced good work product. He said that he had warned JDL that his job would entail tasks other than clerkship work. Twice the Judge suggested complaining to HR in Morristown, or to Assignment Judge Weisenbeck. JDL relied that he didn't want to do that, for reasons of confidentiality, and hoped they could work out their problems. JDL said he was not going to quit, and would "shovel snow" if the judge asked him to. They shook hands. (¶ 80)[7]

---

[7]    Again, I quote the allegations in full:

80. In this conversation the following was said (this is not intended to be complete recital of conversation):

a) J.L.D. complained about finding his phone disabled on November 21, 2014. J.L.D. specifically told Judge Gannon, "that he didn't like that [Judge Gannon] had disabled his phone." Judge Gannon responded by saying he didn't appreciate J.L.D. "copping [fn. 17 Slang term. *Verb*. Meaning to receive.] and attitude with him" [*sic*] in their November 20, 2014 phone conversation and suggested he was being "oppositional."

b) J.L.D. told Judge Gannon his approach to his judicial and administrative duties "killed his motivation." He asked Judge Gannon to work more as a "team" and that said "everyone needs to do their jobs." It was clear from the conversation that J.L.D. was referring to Judge Gannon not reading cases or deciding them fairly on their merits.

c) J.L.D. said he thought Judge Gannon at the very least should his read his statement of reasons and/or write ups. Judge Gannon responded by saying if there was a problem with J.L.D.'s writing he would let him know. He told J.L.D. he had a good work product.

d) J.L.D. told Judge Gannon that he didn't like doing his personal tasks and that he had a "full plate" with all of his responsibilities at work, to the point he didn't think he was capable of doing his personal tasks and performing his judicial responsibilities effectively. Judge Gannon responded by saying "I told you in your interview you would be responsible for completing other tasks besides clerkship work."

e) At least twice in the conversation, Judge Gannon brought up complaining to HR in Morristown and Judge Weisenbeck. J.L.D. told Judge Gannon he "he did not want to do that" because he valued the confidentiality and closeness of the judge/law clerk relationship and that they should be able to work out problems amongst themselves.

f) Judge Gannon told J.L.D. in this conversation that J.L.D. had "poisoned the well." J.L.D. responded that "he was just telling him how he felt and thought we could improve our relationship and workplace efficiency."

On December 4, 2014, Judge Gannon asked JDL to pick up the secretary's paycheck for her. Apparently the pickup did not occur. JDL alleges "on information and belief" that the judge intended to have him sign the secretary's name in connection with the pickup. (¶¶ 81–84)

**December 5 incident and "fabricated story**." On December 5, 2014, Judge Gannon held oral arguments, and appeared to be intoxicated. He claimed to have reviewed files thoroughly, but he could not have done so, because JDL had the files. In one case in which Wiskow was the attorney, "JLD thought Judge Gannon ruled incorrectly and used very questionable reasoning," and also "felt Judge Gannon's ruling was based on his relationship with attorney Philip C. Wiskow and the potential to engage in fraud against Sussex County and/or an insurance company." [8] (¶¶ 85–87)

The judge went out. JLD began to feel dizzy from stress, and went to sit in his car. Returning to chambers, he placed on the bench the file for a motion that was to be heard at 1:30 p.m. that afternoon in the *Falcon Ridge* case. JLD told the judge's secretary, LH, he was feeling dizzy and needed to go home. As he left, he said to LH, "I'm sorry, I know the Judge is probably going to be pissed but I really just need to get out of here right now, I just don't feel well." (¶¶ 89–93)

On December 6, 2014, JLD got a phone call and text message from BG, another law clerk, saying she had heard that on December 5 he had thrown something and stormed out of work. She said that many people at the

---

g) J.L.D. told Judge Gannon that he was not going to quit, "no matter how bad things got" because "he wasn't a quitter." He told Judge Gannon that "he knew [Judge Gannon] was the boss" and that he would "go outside and shovel snow" if Judge Gannon asked him to.

h) The conversation ended in a hand shake.

[8]     (2AC ¶ 87) JLD particularly refers here to *LaFlame v. Loria Timmons,* Docket no. SSX-L-40-13. Allegations based on what JLD "thought" or "felt" would probably not support a cause of action in their own right. Here, however, he is alleging retaliation based on his reporting of his thoughts and feelings that wrongdoing had occurred, a distinct claim. I see no specific allegation, however, that JLD discussed this case with Judge Gannon.

courthouse had heard the same story, and that Judge Gannon was repeating it. (¶¶ 94–95)

"JLD was scheduled to 'mediate' with BG on Monday December 8, 2014." (The meaning of this is unclear.) The night before, JLD contacted BG and told her he would not be coming in. He also told her he would not be calling in his absence to Judge Gannon or the secretary, to avoid being harassed. (¶ 98)

JLD stayed home from work on Monday, December 8, 2014. At 11 am, JLD received a voice mail from Susan Chait, the Human Resources Director, noting that JLD had left work early on Friday and had not appeared on Monday.

At 2 pm on December 8, 2014, JLD's father came to his apartment to say that he had heard about the storming/throwing incident. His father said that if JLD quit or was fired it would end his career. JLD's father related that Judge Gannon had contacted him, saying he had "two boys of his own," and that JLD should be "thankful" he was being allowed to return. JLD's father urged him to finish out the year with Judge Gannon. (¶¶ 100–01)

At 2:30 pm on December 8, 2014, JLD left Judge Gannon a voice mail objecting to the spreading of the "fabricated story" about "storming out" and "throwing something." At 3 pm he called the HR Director, Chait, and told her that Judge Gannon was engaged in gross judicial and administrative misconduct, but gave no details. Chait responded that reassignment would probably not be possible. She orally referred JLD to the Employee Assistance Program, and followed up with an email about the EAP. At 4:30 pm the judge's secretary called and told JLD to report the following morning to the Morristown Courthouse, where Judge Gannon would be trying a case. (¶¶103–04)

At 11:30 pm that night, JLD sent the HR director an email attaching a letter (the "December 8 letter");[9] a draft of his plan to increase workplace efficiency; and 23 examples of his work product. (¶ 105)

---

[9]      The 2AC ¶ 105 states that a copy of this letter is attached as Exhibit A. It is not.

On December 9, 2014, JLD reported to the Morristown Courthouse and had a conversation with Judge Gannon. He objected to the judge's having called his father and to the spreading of the "fabricated story." Judge Gannon responded that he possessed a written statement from the secretary to the effect that JLD had thrown a water bottle.  He called JLD a "threat" and a "disgruntled law clerk," and was unreceptive to JLD's suggestions for improving the work environment. He told JLD his key card would be disabled and the process of firing was underway. He offered two options: sign up for treatment to deal with his "behavior/mental health problems" or be terminated. Judge Gannon agreed to give JLD a day to think it over. (¶ 106) JLD called the HR manager, Chait, who said he could be reassigned to "any division he wanted," and shortly thereafter he was reassigned to the Presiding Civil Division Judge, Rosemary E. Ramsay, in Morris County, as of December 10, 2014. (¶¶ 107–10)

On the morning of December 10, 2014, JLD ran into Judge Gannon, who was unaware of the reassignment. Judge Gannon softened, saying he had changed his mind, that he would accommodate JLD's requests for changes in the running of chambers, and would no longer require mental health counseling as a condition of continued employment. (¶¶ 111–12) Thereafter, at 11 a.m., JLD met with Assignment Judge Weisenbeck, Judge Ramsay, HR Director Chait, and the Trial Court Administrator. When he complained that Judge Gannon did not want to work and was spreading a false story, Weisenbeck allegedly replied "I know" and said that Gannon was not considered a credible source. (¶ 114)

On January 7, 2015, JLD was interviewed by Lou Taranto and John Tonelli of the Advisory Committee on Judicial Conduct. JLD alleges "on information and belief" that they focused on him, rather than on the allegations against Judge Gannon, and that their interviews of coworkers were an attempt to discredit JLD. [10]

---

[10]    The 2AC alleges on information and belief that Judge Gannon was interviewed by Taranto and Tonelli in October 2014. The subject matter is unknown to JLD.

JLD was terminated on February 10, 2015. The circumstances are not stated. (¶ 173(c))

Here the narrative leaves off and the 2AC makes allegations of an overarching "conspiracy amongst a group of families in New Jersey (hereinafter 'NJ Conspiracy')." Judge Gannon's infringements of his rights, alleges JLD, "stemmed from" this conspiracy. Parents, he says, force their offspring to engage in fraud, employing tactics of abuse, manipulation and blackmail. Typically, when the conspiracy is threatened, parents and the professional network of the offspring retaliate. Indeed, "mental health professionals within the conspiracy can diagnose an individual that threatens the conspiracy being as 'psychotic' or some similar condition." JLD alleges that Judge Gannon employed personal connections to decide cases and participate in the NJ Conspiracy for financial gain. (¶¶ 120–23)

JLD believes that a particular case, *Verhage v. Interstate Waste Service*, SSX-L-173-13, involved fraud. The basis for his belief is as follows. Judge Gannon discovered that JLD was in a relationship with DG, who was employed by Interstate Waste Services. The judge became anxious, brought up the subject of "the mob" and "conspiracy," and generally encouraged JDL to see other women. "Based on information and belief J.L.D.'s grandfather (John P. Dearie) committed insurance fraud with the assistance of attorney Joseph Bell. Based on information and belief this family is also associated with Bell Environmental." Bell Environmental, according to the complaint, is one of several companies that is interchangeable or affiliated with Interstate Waste. (¶¶ 124–29)

In *New Jersey Indemnity Insurance Co. and New Jersey Manufacturers Insurance Co. v. Macia*, SSX-L-624-10, the insurers challenged a settlement entered by Judge Gannon. JLD's has reviewed the file and believes "the facts suggest potential fraudulent activity." In connection with the motion challenging the settlement, Judge Gannon failed to review the file. (¶ 130)

The final section of the Facts in the complaint is entitled "Participation in Conspiracy by the Advisory Committee on Judicial Conduct." It asks the court

to take judicial notice of a case, *Dunleavy v. Gannon*, 11-cv-036, which is said to "suggest" that Lou Taranto and John Tonelli were in a conspiracy with Gannon. (¶ 134)[11] It then lists a number of other litigations in which Andrew Frazer of Laddy Clark and Ryan represented the prevailing plaintiff. (¶¶ 135–36) Lou Taranto is alleged to have denied knowledge of one of those cases and of the Laddy Clark and Ryan firm. (¶ 137)

Counts I (¶¶ 140-50) and II (¶¶ 151–63), brought under 42 U.S.C. § 1983 against Judge Gannon, the New Jersey Judiciary, and the State of New Jersey, allege retaliation for exercise of First Amendment Rights and deprivation of due process. The alleged exercise of First Amendment rights consisted of JLD's November 20 and December 1, 2014, confrontations of Judge Gannon with accusations of using personal relationships, using the law clerk to decide matters reserved for a judge, and activity suggesting the use of judicial powers for illegal financial gain from fraud. The deprivation of due process allegedly occurred in connection with spreading a fabricated story that JLD had thrown something and stormed out on December 5, 2014, without granting JLD a prior hearing.

Count III (¶¶ 164–74), a "whistleblower" claim under the Conscientious Employees Protection Act ("CEPA"), N.J. Stat. Ann. § 34:19-1, *et seq.*, against all defendants, alleges that JLD suffered adverse employment actions in retaliation for speaking to Judge Gannon about his misconduct.

Count IV (¶¶ 175–86) is brought against "the New Jersey Judiciary, Lou Taranto and John Tonelli."[12] It alleges "violation of due process rights by being

---

[11]    There is no further explanation. I have inspected the docket of that case, which was filed in this court. There, an unsuccessful state court litigant sued the presiding judge, Judge Gannon, as well as many others, including Tonelli as a member of the Advisory Committee. It appears that then-Judge Cavanaugh of this Court dismissed the case, awarded sanctions in favor of certain defendants, and enjoined that plaintiff from filing any further litigations without leave of the Court.

[12]    This count states that it is brought "in the alternative, against the New Jersey Judiciary, Thomas L. Weisenbeck, and Rosemary E. Ramsay." Weisenbeck and Ramsay, judges of the Superior Court, were named as defendants in the original complaint, but dropped in subsequent versions. This count states that it is brought under § 1983, "or in the alternative, negligent supervision § 213 of the Restatement

deliberately indifferent to a 'state created danger' 42 U.S.C. § 1983."

Count V, brought against all defendants, alleges defamation or false light. Although JLD acknowledges leaving work in the middle of the day on December 5, 2014, the alleged falsity consists of Judge Gannon's statements that JLD "stormed out" and "threw something."

Count VI, brought against all defendants, alleges intentional or negligent infliction of emotional distress.

## II.   STANDARD OF REVIEW

### 1. Rule 12(b)(1) Standard

A motion to dismiss for lack of subject matter jurisdiction pursuant to FED. R. CIV. P. 12(b)(1) may be raised at any time. *Iwanowa v. Ford Motor Co.*, 67 F. Supp. 2d 424, 437-38 (D.N.J. 1999). Rule 12(b)(1) challenges are either facial or factual attacks. *See* 2 JAMES WM. MOORE, MOORE'S FEDERAL PRACTICE § 12.30[4] (3d ed. 2007). The defendant may facially challenge subject matter jurisdiction by arguing that the complaint, on its face, does not allege sufficient grounds to establish subject matter jurisdiction. *Iwanowa*, 67 F. Supp. 2d at 438. Under this standard, a court assumes that the allegations in the complaint are true, and may dismiss the complaint only if it appears to a certainty that the plaintiff will not be able to assert a colorable claim of subject matter jurisdiction. *Id.*

The state judiciary defendants' argument that they are immune from suit based on the Eleventh Amendment is postured as a facial challenge to the jurisdictional basis of the complaint. Accordingly, the Court will take the allegations of the complaint as true. *See Gould Elecs., Inc. v. U.S.*, 220 F.3d 169, 178 (3d Cir. 2000).

### 2. Rule 12(b)(6) Standard

FED. R. CIV. P. 12(b)(6) provides for the dismissal of a complaint, in whole or in part, if it fails to state a claim upon which relief can be granted. The

---

(Second) of Agency." I interpret Count IV as a § 1983 claim against the Judiciary, Taranto, and Tonelli.

moving party bears the burden of showing that no claim has been stated. *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005). In deciding a motion to dismiss, a court must take all allegations in the complaint as true and view them in the light most favorable to the plaintiff. *See Warth v. Seldin*, 422 U.S. 490, 501 (1975); *Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts Inc.*, 140 F.3d 478, 483 (3d Cir. 1998); *see also Phillips v. County of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008) ("reasonable inferences" principle not undermined by later Supreme Court *Twombly* case, *infra*).

FED. R. CIV. P. 8(a) does not require that a complaint contain detailed factual allegations. Nevertheless, "a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief requires more than labels and conclusions, and formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Thus, the factual allegations must be sufficient to raise a plaintiff's right to relief above a speculative level, such that it is "plausible on its face." *See id.* at 570; *see also Umland v. PLANCO Fin. Serv., Inc.*, 542 F.3d 59, 64 (3d Cir. 2008). A claim has "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). While "[t]he plausibility standard is not akin to a 'probability requirement' ... it asks for more than a sheer possibility." *Iqbal*, 556 U.S. at 678 (2009).

The United States Court of Appeals for the Third Circuit has provided a three-step process for analyzing a Rule 12(b)(6) motion:

> To determine whether a complaint meets the pleading standard, our analysis unfolds in three steps. First, we outline the elements a plaintiff must plead to a state a claim for relief. *See* [*Iqbal*, 556 U.S.] at 675; *Argueta* [*v. U.S. Immigration & Customs Enforcement*, 643 F.3d 60, 73 (3d Cir. 2011)]. Next, we peel away those allegations that are no more than conclusions and thus not entitled to the assumption of truth. *See Iqbal*, 556 U.S. at 679; *Argueta*, 643 F.3d at 73. Finally, we look for well-pled factual

allegations, assume their veracity, and then "determine whether they plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679; *Argueta*, 643 F.3d at 73. This last step is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

*Bistrian v. Levi,* 696 F.3d 352, 365 (3d Cir. 2012).

Plaintiff JLD is trained in the law, but is proceeding *pro se.* The complaint is therefore "to be liberally construed," and, "however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 93-94 (2007). Nevertheless, it must meet some minimal standard. "While a litigant's pro se status requires a court to construe the allegations in the complaint liberally, a litigant is not absolved from complying with *Twombly* and the federal pleading requirements merely because s/he proceeds pro se." *Thakar v. Tan*, 372 Fed. App'x 325, 328 (3d Cir. 2010) (citation omitted).

### III.   JURISDICTION, AMENABILITY TO SUIT, IMMUNITY

I first discuss threshold issues of jurisdiction, amenability to suit, and immunity as they apply to Judge Gannon and to the State Defendants (*i.e.,* the State of New Jersey and the New Jersey Judiciary, as well as Lou Taranto and John Tonelli as members of the Advisory Committee on Judicial Conduct ("ACJC")).[13]

#### 1. Eleventh Amendment

I first consider the motion to dismiss brought by the State Defendants on Eleventh Amendment grounds. Defendant Judge Gannon is a member of the

---

[13]     In this section, I set aside the distinct considerations that apply to defendant Dorsey & Semrau, LLC, a private law firm. The federal-law § 1983 claims, for good legal reasons, are not asserted against the Dorsey firm. *See Steward v. Meeker*, 459 F.2d 669, 669-70 (3d Cir. 1972)(private attorney was not a state actor under Section 1983); *Polk County v. Dodson*, 454 U.S. 312 (1981)(even court-appointed defense attorneys do not act under the color of state law for purposes of Section 1983).

State Judiciary, and to that extent the discussion applies to claims against him as well.

The Eleventh Amendment to the Constitution, which is of jurisdictional stature, renders the states immune from claims in federal court: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. Amend. XI. For more than a century, the Eleventh Amendment has been held more broadly to bar citizens from bringing suits for damages against any non-consenting state in federal court. *Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 100-101,104 S. Ct. 900, 908 (1984) (Eleventh Amendment prohibits "suits brought in federal courts by [a State's] own citizens as well as by citizens of another state"); *Kelley v. Edison Twp.*, No. 03-4817, 2006 WL 1084217, at *6 (D.N.J. Apr. 25, 2006) (citing *Bennett v. City of Atl. City*, 288 F. Supp. 2d 675, 679 (D.N.J. 2003)); *see also Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 54, 116 S. Ct. 1114, 1122 (1996); *Edelman v. Jordan*, 415 U.S. 651, 662–63, 94 S. Ct. 1347, 1355 (1974); *Hans v. Louisiana*, 134 U.S. 1, 10, 10 S. Ct. 504, 505 (1890). Those holdings exceed the literal wording of the Eleventh Amendment, incorporating more general concepts of sovereign immunity, but they are far too well established to be contested here.

The claims of the 2AC are thus barred to the extent they are asserted against the State of New Jersey. The "State Judiciary" as a body, *i.e.*, an agency of the State, partakes of the same immunity. Members of the State Judiciary, including Judge Gannon, as well as the individual State Defendants, Taranto and Tonelli, as members of the ACJC, stand in the shoes of the State and are accordingly entitled to the same Eleventh Amendment protection against official-capacity claims. *See Robinson v. New Jersey Mercer County Vicinage-Family Div.*, 514 Fed. App'x 146, 149 (3d Cir. 2013) (New Jersey county court was "clearly a part of the state of New Jersey," so "both the court itself and its employees in their official capacities were unconsenting state entities entitled

to immunity under the Eleventh Amendment") (citing *Benn v. First Judicial Dist. Of Pa.*, 426 F.3d 233, 240 (3d Cir. 2005)); *Dongon v. Banar*, 363 Fed. App'x 153, 155 (3d Cir. 2010) ("[T]he state courts, its employees, and the judges are entitled to immunity under the Eleventh Amendment....") (citing *Johnson v. State of N.J.*, 869 F. Supp. 289, 296-98 (D.N.J. 1994)); *Adamo v. Jones*, No. CV 15-1073 (MCA), 2016 WL 356031, at *8–9 (D.N.J. Jan. 29, 2016) (suit against state entities, including ACJC, is in substance a suit against the State of New Jersey, subject to the Eleventh Amendment).

Exceptions to the Eleventh Amendment immunity involve either (1) explicit abrogation of sovereign immunity pursuant to § 5 of the Fourteenth Amendment, *Bd. of Trustees of the Univ. of Ala. v. Garrett*, 531 U.S. 356, 364–65, 121 S. Ct. 955, 962–63 (2001); or (2) the State's consent, by litigation conduct or statute, to waive sovereign immunity, *Lapides v. Bd. Of Regents*, 535 U.S. 613, 619–24, 122 S. Ct. 1640, 1643–46 (2002); *Port Auth. Trans-Hudson Corp. v. Feeney*, 495 U.S. 299, 305–06, 110S. Ct. 1868, 1873 (1990). *See generally In re Sacred Heart Hosp. v. Commonwealth of Pennsylvania*, 133 F.3d 237, 242 (1998) (stating abrogation and waiver exceptions).[14]

The first exception (Congressional abrogation) does not apply. The federal statute under which plaintiff sues in Counts I, II, and IV is 42 U.S.C. § 1983. Although Congress may in some circumstances override a state's sovereign immunity, it did not do so when it enacted Section 1983. *Quern v. Jordan*, 440 U.S. 332, 342, 99 S. Ct. 1139, 1146 (1979). Monetary claims for deprivations of civil rights under Section 1983 are therefore subject to the Eleventh Amendment sovereign immunity bar. *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 58 (1989). State law claims asserted in federal court pursuant to the court's ancillary jurisdiction are likewise barred. The ancillary jurisdiction statute, 28 U.S.C. § 1367, does not override the States' sovereign immunity. *Raygor v. Regents of the University of Minnesota*, 534 U.S. 533, 541, 122 S. Ct.

---

[14]    The Eleventh Amendment is also inapplicable to an action against a state official to enjoin ongoing violations of federal law, *Edelman v. Jordan*, 415 U.S. 651, 677, 94 S. Ct. 1347, 1362 (1974); *Ex Parte Young*, 209 U.S. 123, 28 S. Ct. 441 (1908).

999, 1005 (2002); *Figueroa v. City of Camden,* 580 F. Supp. 2d 390, 405 (D.N.J. 2008). It is jurisdictional only.

JLD relies primarily on the second exception (the State's waiver of its sovereign immunity). Such a waiver cannot be found in a mere general amenability to suit. The State must specifically waive immunity from suit *in federal court,* and the waiver must be explicit and clear:

> The Court will give effect to a State's waiver of Eleventh Amendment immunity "only where stated by the most express language or by such overwhelming implication from the text as [will] leave no room for any other reasonable construction." *Atascadero State Hospital* [*v. Scanlon,* 473 U.S. 234, 239-40, 105 S. Ct. 3142 (1985)] (quoting *Edelman v. Jordan,* 415 U.S. 651, 673, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974) (internal quotation omitted)). A State does not waive its Eleventh Amendment immunity by consenting to suit only in its own courts, see, e.g., *Florida Dept. of Health and Rehabilitative Services v. Florida Nursing Home Assn.,* 450 U.S. 147, 150, 101 S. Ct. 1032, 67 L. Ed. 2d 132 (1981) (per curiam), and "[t]hus, in order for a state statute or constitutional provision to constitute a waiver of Eleventh Amendment immunity, it must specify the State's intention to subject itself to suit in federal court." *Atascadero State Hospital, supra,* 473 U.S. at 241, 105 S. Ct. 3142.

*Port Auth. Trans-Hudson Corp. v. Feeney,* 495 U.S. at 305–06, 110 S. Ct. at 1873.

Contrary to JLD's argument, no such waiver appears in the New Jersey Tort Claims Act ("NJTCA"), N.J. Stat. Ann. § 59:1-1 *et seq.* In the NJTCA, the State consents to be sued in its own courts under certain conditions, but there is no indication of consent to suit in federal court. *See Hyatt v. County of Passaic,* 340 F. App'x 833, 837 (3d Cir. 2009) (holding that NJTCA is not Eleventh Amendment waiver). Nor does the New Jersey Law against Discrimination ("NJLAD"), N.J. Stat. Ann. § 10:5-1 *et seq.,* create such a waiver as to a NJLAD claim. Although there exists a cause of action against the State as employer, the State has not consented to waive its immunity from suit in federal court. *See Rudolph v. Adamar of N.J., Inc.,* 153 F. Supp. 2d 528, 540–44 (D.N.J. 2008); *Bennett v. Atlantic City,* 288 F. Supp. 2d 675, 683 (D.N.J. 2003).

*A fortiori,* NJLAD creates no waiver as to the non-NJLAD claims asserted here. Nor does CEPA, the only state statute under which JDL does assert a claim, contain any such waiver of Eleventh Amendment immunity. *See Figueroa v. City of Camden,* 580 F. Supp. 2d 390, 405 n.21 (D.N.J. 2008) ("Similarly, there is no language in CEPA that indicates the State has waived its Eleventh Amendment immunity and consented to suit in federal court.")

The claims against the State and its Judiciary, as well as the claims against the individual defendants in their official capacities, are barred by the Eleventh Amendment. They will be dismissed on jurisdictional grounds, pursuant to Fed. R. Civ. P. 12(b)(1).

### 2. "Persons" Under § 1983

Closely related to Eleventh Amendment immunity, but distinct, is the principle that State entities and officials in their official capacities are not "persons" amenable to suit under Section 1983.[15]

Section 1983 imposes liability on "[e]very *person,* who, acting under color of any statute, ordinance, regulation, custom, or usage, of any State" subjects a person to a deprivation of certain rights. 42 U.S.C. § 1983 (emphasis added). "[N]either a State nor its officials acting in their official capacities are 'persons' under § 1983." *Hafer v. Melo,* 502 U.S. 21, 26, 112 S. Ct. 358, 362 (1991) (quoting *Will v. Michigan Dep't of State Police,* 491 U.S. 58, 71, 109 S. Ct. 2304, 2312 (1989)). An action against a State agent in that agent's official capacity is considered an action against the State itself, not one against a "person." *Kentucky v. Graham,* 473 U.S. 159, 165, 105 S. Ct. 3099, 3104 (1985).

---

[15]    "This does not mean, as petitioner suggests, that we think that the scope of the Eleventh Amendment and the scope of § 1983 are not separate issues. Certainly they are. But in deciphering congressional intent as to the scope of § 1983, the scope of the Eleventh Amendment is a consideration, and we decline to adopt a reading of § 1983 that disregards it." *Will v. Michigan Dep't of State Police,* 491 U.S. 58, 66–67, 109 S. Ct. 2304, 2310 (1989) Cases, including mine, have for brevity run the two issues together. *See, e.g., Endl v. New Jersey,* 5 F. Supp. 3d 689, 696 (D.N.J. 2014) (McNulty, J.). Either way, the disqualifying factor is that the defendant is, or acts on behalf of, the State.

For this reason, too, the § 1983 claims against the State and against its agents, the individual defendants in their official capacities, must be dismissed.

### 3. Immunity

As established above, the Eleventh Amendment and the § 1983 definition of a "person" bar JDL's federal court claims against the State and its agencies, as well as his claims against the individual defendants in their official capacities. Natural persons, however, unlike state agencies, can be sued in their personal capacities. And against the defendant individuals, the 2AC does assert personal-capacity claims.

Judge Gannon, for example, is sued in his official capacity, but also in his "personal" or "non-judicial" capacity for administrative actions, tortious conduct, and conduct outside the scope of employment. (2AC ¶ 2) Taranto and Tonelli are sued in their "official capacity as court administrators and personal capacity for malicious conduct." (2AC ¶ 4)

### a. Availability of immunity defense in personal-capacity suit

The Eleventh Amendment, as stated above, bars official-capacity suits, but permits personal-capacity suits. Under § 1983, too, individuals named in their personal capacities are amenable to suit as "persons." *Estate of Lagano v. Bergen County Prosecutor's Office*, 769 F.3d 850, 856 (3d Cir. 2014). Such personal-capacity § 1983 claims may be brought against government officials, even if the acts for which they are sued happen to be official acts. *Hafer v. Melo*, 502 U.S. 21, 27, 112 S. Ct. 358, 363 (1991). Thus the State Defendants miss the point to some extent in stating that "neither Mr. Taranto nor Mr. Tonelli has the ability to conduct such an investigation in their individual capacities." (ECF no. 50-1 at 14) It is true, of course, that these defendants could only have performed their investigation by virtue of their official positions. By the same token, defendant Gannon could not have taken action against his law clerk unless he had first been first appointed a judge. But these individuals may still be subject to suit in their personal capacities.

Against such personal-capacity § 1983 claims, however, there are additional theories of defense. For example, defendants may assert personal immunities:

> Personal-capacity suits, on the other hand, seek to impose individual liability upon a government officer for actions taken under color of state law. Thus, "[o]n the merits, to establish personal liability in a § 1983 action, it is enough to show that the official, acting under color of state law, caused the deprivation of a federal right." [quoting *Kentucky v. Graham,* 473 U.S. at 166, 105 S. Ct. at 3105]. While the plaintiff in a personal-capacity suit need not establish a connection to governmental "policy or custom," officials sued in their personal capacities, unlike those sued in their official capacities, may assert personal immunity defenses such as objectively reasonable reliance on existing law. *Id.,* at 166–167, 105 S. Ct., at 3105–3106.

*Hafer*, 502 U.S. at 25, 112 S. Ct. at 362. I consider such immunity defenses in the following subsections.

### b.    Immunity of Taranto and Tonelli

Taranto and Tonelli, sued on the basis of actions they took as members of the ACJC, assert that they are immune from suit under N.J. Ct. R. 2:15-22. The ACJC, appointed by the New Jersey Supreme Court, sits to perform investigations and hold hearings on misconduct, fitness to serve, and like matters with respect to Judges of the Superior Court and other state judges. Members of the ACJC, who are drawn from the ranks of retired judges, the bar, and the public, serve without compensation. The ACJC has subpoena power, and attorneys are required to cooperate with its investigations. It adjudicates charges of wrongdoing, employing a clear and convincing standard of proof. Ultimate authority, however, rests with the State Supreme Court, which may seek removal of a judge, or whatever other sanction it deems appropriate, based on the Committee's presentment. N.J. Ct. R. 2:15–1 through 25, *passim*.

The Rules of Court by which the ACJC is formed confer absolute immunity on the members of the Committee, witnesses, and complainants:

**2:15-22. Immunity From Suit**

(a) The members and staff of the Committee shall be absolutely immune from suit, whether legal or equitable in nature, for any conduct in the performance of their official duties.

(b) Witnesses and persons who bring to the Committee allegations concerning a judge shall be absolutely immune from suit, whether legal or equitable in nature, for all communications to the Committee or to its staff and for any testimony given at proceedings before the Committee, a three-judge panel, or the Supreme Court. This immunity shall not extend to any other publication or communication of such information.

N.J. Ct. R. 2:15-22.

Other judges of this Court have dismissed federal claims against members of the ACJC—indeed, against Tonelli himself—based on N.J. Ct. R. 2:15-22. *See Campbell v. Supreme Court of New Jersey,* No. CIV.A. 11-555 ES, 2012 WL 1033308, at *9 (D.N.J. Mar. 27, 2012). I agree, and will do the same.

I consider also an alternative form of immunity. Quasi-judicial or prosecutorial immunity may independently attach, irrespective of any rule or statute:

> Quasi-judicial immunity is given only to public employees who perform judge-like functions and attaches when a public official's role is functionally comparable to that of a judge. *Hamilton v. Leavy,* 322 F.3d 776, 785 (3d Cir. 2003). "When judicial immunity is extended to officials other than judges, it is because their judgments are 'functionally comparable' to those of judges—that is because they, too, 'exercise a discretionary judgment' as part of their function." *Antoine v. Byers & Anderson, Inc.,* 508 U.S. 429, 436, 113 S. Ct. 2167, 124 L. Ed. 2d 391 (1993).

*Ingram v. Twp. of Deptford,* 858 F. Supp. 2d 386, 390 (D.N.J. 2012). *Cf. Keystone Redevelopment Partners, LLC v. Decker,* 631 F.3d 89 (3d Cir. 2011) (quasi-judicial immunity attaches to state gaming control board, which decides applications for slot machine licenses); *Dotzel v. Ashbridge,* 438 F.3d 320, 324–27 (3d Cir. 2006) (reversing district court denial of immunity to members of township board of supervisors who denied application for conditional use permit); *Omnipoint Corp. v. Zoning Hearing Bd.,* 181 F.3d 403, 409 (3d Cir.1999) (holding, for immunity purposes, that a zoning board acted in a

quasi-judicial capacity when it denied a conditional use permit). Factors that have guided the courts in those determinations have included the need to insulate the function from outside pressure; institutional safeguards against improper conduct; insulation from political influence; the role of legal standards and precedent; the availability of adversary proceedings; and the availability of appellate review. *See, e.g., Dotzel*, 438 F.3d at 325 *et seq.* (citing *Butz v. Economou*, 438 U.S. 478, 98 S. Ct. 2894 (1978).

The ACJC fits easily within the confines of that analysis. Itself an adjunct of the State Supreme Court, its members are appointed by the Court to serve three-year terms. N.J. Ct. R. 2:15-2. The Committee investigates and holds hearings, in which the integrity and livelihood of the judiciary are at stake; the need for independence is obvious. It operates under the ultimate supervision and oversight of the Supreme Court. It is isolated from politics in that any member's election to public office, appointment to the judiciary, or holding of any other incompatible office is immediate grounds for termination. N.J. Ct. R. 2:15-2. The decisions of the Committee are governed and confined by legal standards—in particular, the Code of Judicial Conduct. Its proceedings, once the formal complaint stage has been reached, including hearings, are public. The proceedings are adversarial. The ACJC issues written presentments, which are publicly available. The New Jersey Supreme Court sits in direct review and in a proper case will issue an order to show cause why discipline should not be imposed. *See www.judiciary.state.nj.us/acjc/index.html* (information about the ACJC, online postings of hearings, orders, presentments, orders to show cause).

Thus it is not surprising that our Court of Appeals, albeit in a non-precedential case, has recognized that the ACJC is entitled to absolute immunity by virtue of its function, which partakes of both the judicial and the prosecutorial:

> Kwasnik's allegations against the members of the Advisory
> Committee relate to the denial of his first judicial misconduct
> complaint against Judge LeBlon, and to the Advisory Committee's
> failure to rule on his second misconduct complaint against Judge

LeBlon. The defendants argued in District Court that the Advisory Committee members enjoy quasi-judicial immunity. Absolute immunity does not apply in every action against a judge or court personnel. Rather, "it [is] the nature of the function performed, not the identity of the actor who performed it, that informs[ ] [an] immunity analysis." *Forrester v. White*, 484 U.S. 219, 229, 108 S. Ct. 538, 98 L.Ed.2d 555 (1988). "When judicial immunity is extended to officials other than judges, it is because their judgments are 'functional[ly] comparab[le]' to those of judges—that is, because they, too, 'exercise a discretionary judgment' as a part of their function." *Antoine v. Byers & Anderson, Inc.*, 508 U.S. 429, 436, 113 S. Ct. 2167, 124 L. Ed. 2d 391 (1993) (citations omitted). In Kwasnik's case, the acts complained of are the kind of discretionary acts normally performed by a judge. The Advisory Committee members were well within their authority to consider Kwasnik's complaints against Judge LeBlon pursuant to New Jersey Supreme Court Rule 2:15–1 and N.J.S.A. § 2b:2a–10. Thus, the committee members enjoy quasi-judicial immunity from suit. To the extent that their actions are prosecutorial in nature, the Committee members are protected by prosecutorial immunity. *See Imbler v. Pachtman*, 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976).

*Kwasnik v. LeBlon*, 228 F. App'x 238, 243–44 (3d Cir. 2007). Indeed, Judge Arleo of this Court has recently ruled that absolute immunity attached to the acts of Tonelli himself, as Executive Director of the ACJC. *Adamo v. Jones*, No. CV 15-1073 (MCA), 2016 WL 356031, at *8 (D.N.J. Jan. 29, 2016); *see also Campbell*, 2012 WL 1033308, at *10. In all three cases, the plaintiff complained (like JLD here) that the ACJC had investigated but declined to pursue charges against a judge.

Under the State rules and the more general federal immunity principles cited above, the members of the ACJC are absolutely immune. JLD's claims arise from the manner in which he alleges that Taranto and Tonelli performed their duties. JLD believes that Judge Gannon was investigated in some manner in October 2014, although he does not know any more than that. JLD essentially alleges that Gannon should have been disciplined, and that if he had been reined in, he would not have perpetrated the alleged acts of discrimination and retaliation against JLD. JLD also alleges on information

and belief that, when investigating and considering his own complaints against Judge Gannon, Taranto and Tonelli devoted inordinate attention to the actions of JLD himself. He faults them for failure to bring charges against Judge Gannon, and also complains that the confidentiality of pre-complaint proceedings made it difficult for him to publicize Gannon's wrongdoing or clear his own name.

It is the nature of the function, not the rightful or wrongful manner in which it was performed, that governs the immunity inquiry. Taranto and Tonelli clearly were discharging their duty of considering and investigating complaints against judicial officers, in connection with the investigative and adjudicative mission of the ACJC. Whether viewed under N.J. Ct. R. 2:15-22 or more general principles of judicial and prosecutorial immunity, the issue requires the same resolution. I hold that defendants Taranto and Tonelli are absolutely immune from suit.

### c.   Judicial immunity of Judge Gannon

As to Judge Gannon, more traditional doctrines of judicial immunity come into play. Absolute judicial immunity erects a barrier to suit, virtually impenetrable where it applies, but not unlimited in breadth. Here, it does not apply, because JLD sues Gannon in his capacity as employer.

A judicial officer in the performance of his or her duties has absolute immunity from suit. *Mireles v. Waco*, 502 U.S. 9, 12, 112 S. Ct. 286, 288 (1991). That absolute judicial immunity applies to all claims, whether official-capacity or personal-capacity, that are based on judicial acts. *See Dongon*, 363 F. App'x at 155 ("[J]udges are entitled to absolute immunity from liability based on actions taken in their official judicial capacity.") (citing *Briscoe v. LaHue*, 460 U.S. 325, 334 (1983)). *See also Mireles v. Waco*, 502 U.S. 9, 112 S. Ct. 286 (1991); *Stump v. Sparkman*, 435 U.S. 349, 359 (1978); *Pierson v. Ray*, 386 U.S. 547, 554 (1967); *Capogrosso v. The Supreme Court of New Jersey*, 588 F.3d 180, 184 (3d Cir. 2009); *Ludwig v. Berks County*, 313 F. App'x 479, 482 (3d Cir. 2008) ("In his personal capacity, Judge Keller has absolute immunity

from liability for his judicial acts.") (citing *Azubuko v. Royal,* 443 F.3d 302, 303 (3d Cir. 2006)). "A judge will not be deprived of immunity because the action he took was in error, was done maliciously, or was in excess of his authority...." *Stump v. Sparkman,* 435 U.S. 349, 356–57, 98 S. Ct. 1099, 1105 (1978) (citation omitted). The immunity is not vitiated by "allegations of malice or corruption of motive." *Gromek v. Maenza,* 614 F. App'x 42, 45 (3d Cir. 2015) (quoting *Gallas v. Supreme Ct. of Pa.,* 211 F.3d 760, 768 (3d Cir. 2000)).

There are, however, two exceptions to absolute immunity: (1) "a judge is not immune from liability for nonjudicial actions"; and (2) "a judge is not immune for actions, though judicial in nature, taken in the complete absence of all jurisdiction." *Mireles,* 502 U.S. at 11–12, 112 S. Ct. at 288; *see also Stump, supra.* JLD relies on the first exception, for "nonjudicial actions"; he essentially claims that Judge Gannon interacted with him as an employer, not as a judge. The question, then, is whether JLD is suing Judge Gannon for acts that are "judicial in nature."

"Difficulties have arisen primarily in attempting to draw the line between truly judicial acts, for which immunity is appropriate, and acts that simply happen to have been done by judges. Here, as in other contexts, immunity is justified and defined by the functions it protects and serves, not by the person to whom it attaches." *Forrester v. White,* 484 U.S. 219, 227, 108 S. Ct. 538, 544 (1988). "[T]he factors determining whether an act by a judge is a "judicial" one relate to the nature of the act itself, *i.e.,* whether it is a function normally performed by a judge, and to the expectations of the parties, *i.e.,* whether they dealt with the judge in his judicial capacity." *Stump,* 435 U.S. at 362, 98 S. Ct. at 1107. Accordingly, the absolute judicial immunity that attaches to, *e.g.,* a judge's rulings, has not been extended to a judge's legislative or administrative acts. Thus, for example, the act of firing a probation officer, allegedly on a discriminatory basis, was not shielded by absolute immunity. *Forrester,* 484 U.S. at 229–30, 108 S. Ct. at 545–46.

Thus, for example, in *Campbell v. Supreme Court of New Jersey*, Judge Salas of this court found that a State Assignment Judge who demanded the resignation of a municipal court judge was not absolutely immune from a claim of discrimination. No. CIV.A. 11-555 ES, 2012 WL 1033308, at *7 (D.N.J. Mar. 27, 2012) ("supervising court employees and overseeing the efficient operation of a court" are neither "judicial [n]or adjudicative" acts) (quoting *Forrester*, 484 U.S. at 229).

To be sure, the actions alleged by JLD here are intimately tied up with the adjudicative process, in that the plaintiff is the judge's law clerk. I cannot rule at the pleading stage, however, that the acts alleged against Judge Gannon are exclusively adjudicative. JLD alleges, for example, that the judge spread a false rumor about him and retaliated for criticism. Viewed in that light (as it must be, on a motion to dismiss), this was not an adjudicator/litigant relationship; it was an employer/employee relationship.

The motion to dismiss the claims against Judge Gannon on grounds of absolute judicial immunity, then, will be denied.

## IV.  FEDERAL CLAIMS

As a result of the analysis in Section III, *supra*, the entire complaint is dismissed against the following defendants: the State of New Jersey, the New Jersey Judiciary, Taranto, and Tonelli. Thus the federal-law counts that remain are Counts I and II, now asserted against Judge Gannon (in his personal capacity) only.[16] Gannon has moved to dismiss those § 1983 counts for failure to state a claim, pursuant to Fed. R. Civ. P. 12(b)(6). I will deny the motion to dismiss Count I, but grant it without prejudice as to Count II.

### A.    § 1983/First Amendment Retaliation

Count I (2AC ¶¶ 140–150) alleges that Judge Gannon retaliated against JLD for his exercise of First Amendment rights. This Count alleges two instances of protected First Amendment speech: JLD's workplace complaints to

---

[16]    Count IV, a federal § 1983 claim, is asserted only against the New Jersey Judiciary, Taranto, and Tonelli, who have already been dismissed on jurisdictional and immunity grounds. *See* n.12, *supra*.

28

the judge on November 20 and December 1, 2014, designated below as [a] and [b]. It also alleges a third "protected act" under the First Amendment: leaving work on December 5, 2014, and not participating in the oral argument scheduled for that afternoon, an act designated below as [c]. In response, Judge Gannon allegedly committed four acts of retaliation: disabling JLD's phone, looking for a reason to fire him, spreading the false story that he had thrown something and stormed out of the workplace on December 5, and telling JLD he would be terminated unless he agreed to seek mental health counseling.

A First Amendment retaliation claim has three essential elements:

(1) The plaintiff's speech was protected under the First Amendment;

(2) The defendant took an adverse or retaliatory action; and

(3) A causal connection between (1) and (2), *i.e.*, that the protected speech was a substantial or motivating factor in the retaliatory action, shifting the burden of proof to defendant to demonstrate it would have taken the same action absent the protected speech.

*See Miller v. Mitchell,* 598 F.3d 139, 147 (3d Cir. 2010); *Gorum v. Sessoms,* 561 F.3d 179, 184 (3d Cir. 2009); *Hill v. Borough of Kutztown,* 455 F.3d 225, 241 (3d Cir. 2006); *Rauser v. Horn,* 241 F.3d 330, 333 (3d Cir. 2001).

The first element is an issue of law; the second and third are questions of fact. *Baldassare v. New Jersey,* 250 F.3d 188, 195 (3d Cir. 2001); *Johnson v. Lincoln Univ.,* 776 F.2d 443, 454 (3d Cir. 1985); *see also Gorum, supra.* Because factual questions are rarely appropriate for consideration on a motion to dismiss, I set aside the second and third elements for now. Rather, I focus on the first, legal element: whether [a], [b], and [c], assuming they occurred as alleged, were protected by the First Amendment.

First Amendment protection is analyzed very differently in the contexts of private and public employment. A person who goes into government service does not give up the First Amendment right to express oneself freely *as a citizen.* But limitations may be placed on the speech of a public employee *as an*

*employee.* The Supreme Court has stated the reasons for limiting First Amendment protection in the public employee context: first, a citizen in government service accepts certain restrictions on his freedom; second, the government, like any employer, must exercise some control over employees' words and actions; and third, a public employee is in a position of public trust, and cannot be permitted to express views that "contravene governmental policies or impair the proper performance of governmental functions." *Garcetti v. Ceballos*, 547 U.S. 410, 418-19 (2006).

Whether a public employee's speech is protected by the First Amendment depends on the answers to three questions:

> (1) was the plaintiff speaking as a citizen rather than as a public employee discharging her employment duties;
>
> (2) did the plaintiff's statements address a matter of public concern as opposed to a personal interest; and
>
> (3) did the plaintiff's employer have "an adequate justification for treating the employee differently from any other member of the general public" as a result of the statement [the employee] made.

*Montone v. City of Jersey City*, 709 F.3d 181, 192–93 (3d Cir. 2013) (line breaks added) (quoting *Gorum v. Sessoms,* 561 F.3d 179, 185 (3d Cir. 2009), quoting *Garcetti v. Ceballos*, 547 U.S. at 418). A "yes" answer to all three questions is required.

Count I alleges two instances of protected First Amendment speech:

[a] JDL's November 20 complaint to Gannon (*see* p. 7 & n.6, *supra*).

[b] JDL's December 1 complaint to Gannon (*see* pp. 7–8 & n.7, *supra*).

(2AC ¶ 144) As JLD describes it in Count I, he allegedly spoke "to Judge Gannon about Judge Gannon's approach to his judicial and administrative duties, concerning:

- Using personal relationships to decide cases
- Forcing his law clerk to make decisions reserved for a judge
- Activity suggesting the use of his judicial powers for illegal

financial gain from fraudulent activity"

(2AC ¶ 168) (lettering of paragraphs omitted)[17]

I consider the first *Garcetti* factor: whether a public employee is speaking as a citizen, or as an employee. That factor, an issue of law, is perhaps a close call, but I think that more factual context is needed and I will not dismiss on this basis.

An employee speaking pursuant to his or her official duties is not acting "as a citizen," and such statements are not protected by the First Amendment. *Garcetti v. Ceballos*, 547 U.S. at 421; *see also Hill v. Borough of Kutztown*, 455 F.3d 225, 241 (3d Cir. 2006). As the Supreme Court reasoned in *Garcetti*, "restricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen." 547 U.S. at 421. Therefore, "expressions employees make pursuant to their professional duties" fall outside the protections of the First Amendment. *Id.* at 426. Whether a statement is made pursuant to official

---

[17]     This threefold summary of the November 20 and December 1 conversations is a poor match for the factual allegations, which are quoted in full at pp. 7–8, nn. 6 & 7, *supra*. (2AC ¶¶ 76, 80) It incorporates some matters—particularly vague allegations of wrongdoing—that JLD now says were *of concern to him*; it only imperfectly reflects what JLD alleges he *said* in those conversations. According to this twice-amended complaint, JLD voiced complaints of disrespect and not getting enough help, said he wanted to work with the judge as more of a team, and so forth. The 2AC for the first time adds cryptic allegations that JLD confronted Judge Gannon with allegations of fraud or misconduct (albeit in the odd context of seeking a closer working relationship). On November 20, JLD now alleges, he told the judge "he wasn't blind to the facts." This is said to be a reference to Judge Gannon's misconduct. (2AC ¶ 76(c)) On December 1, JLD now alleges, he told Judge Gannon that "everyone needs to do their jobs." This is said to be a reference to Judge Gannon's not reading cases or deciding them fairly on their merits. (2AC ¶ 80(b)) Both of these statements were absent from the detailed descriptions of the conversations in the original and first amended versions of the complaint. (ECF nos. 1, 6)

The alleged retaliation for [a] and [b] consisted of the following:

"In response to JLD's protected speech on November 20, 2014, and December 1, 2014, Judge Gannon committed the following retaliatory acts:

[1] Disabling his work phone
[2] Attempting to find a reason to fire Plaintiff"

(2AC ¶ 147)

duties is a practical inquiry, not limited to the formal elements of the employee's job description. *Id.* at 424. Factors considered include whether the speech fell within the individual's job duties, whether it related to special knowledge or experience acquired on the job, whether it was made inside or outside the work place, and whether it concerned the job's subject matter. *Id.*, 547 U.S. at 420-21; *Gorum,* 561 F.3d at 185.

In short, "the First Amendment does not prohibit managerial discipline based on an employee's expressions made pursuant to official responsibilities." *Garcetti,* 547 U.S. at 424. Reporting to superiors, for example, is unprotected because it does not have a "relevant analogue to speech by citizens who are not government employees." *Id.* Thus the Third Circuit has repeatedly held that "complaints up the chain of command about issues related to an employee's workplace duties—for example, possible safety issues or misconduct by other employees—are within an employee's official duties" and therefore unprotected. *Morris v. Philadelphia Hous. Auth.*, 487 Fed. App'x 37 (3d Cir. 2012) (non-precedential) (holding that plaintiff's reporting instances of potential misconduct of subordinates to his superiors was within his official job duties); *Foraker v. Chaffinch*, 501 F.3d 231, 240 (3d Cir. 2007), *abrogated on other grounds by Borough of Duryea, Pa. v. Guarnieri*, 131 S. Ct. 2488 (2011) ("Price and Warren were acting within their job duties when they expressed their concerns up the chain of command...."); *Hill,* 455 F.3d at 242 (a town borough manager's reports to his superiors about harassment by the town mayor were not protected speech because his reports were made pursuant to his managerial duties)).

Certain of the statements alleged by JLD are classic employment-related complaints up the chain of command. JLD confronted his boss, Judge Gannon, with an array of work-related complaints and suggestions as to how, going forward, they would perform their duties. JLD complained of poor morale, asked Gannon to give him more help, and sought more feedback on his work. He took issue with being asked to perform personal tasks for Judge Gannon. In

short, taking the allegations at face value, the conclusion is inescapable that JLD was speaking as a law clerk, about the performance of his job as a clerk. The subject matter clearly related to the knowledge and experience JLD gained on the job. These were not complaints of a citizen—for example, they were not statements to members of the public, or to some investigative body. On the contrary, JLD was remonstrating with the judge, attempting within the confines of their relationship to change the manner in which judicial business was being conducted in chambers. The statements occurred in conversations between employee and boss, in the workplace, with no one else present. These statements, as reported in the complaint, could only have been made by a public employee, in his capacity as an employee.

It gives me pause, however, that JLD is also alleging that he was confronting Judge Gannon about matters of concern to the citizenry. He believed Judge Gannon was making decisions on the basis of favoritism. He believed Judge Gannon was deciding matters without reading the papers. Also sprinkled throughout the complaint are vague references to "insurance fraud," although these seem to be unsupported by any specific facts. Another barrier to relief may be JLD's allegation that, at the time, he did not seek to disseminate his message, even to the assignment judge. On a motion to dismiss standard, however, I cannot say that these allegations fail to meet the first *Garcetti* requirement.

As to the second *Garcetti* requirement, the allegations are sufficient. The subject matter of the statements—the judge's honest and efficient performance, or not, of judicial duties—would obviously be a subject of great public concern.

As for the third *Garcetti* requirement, the Court is required to apply the so-called *Pickering* balancing test to determine whether this public employer had "adequate justification" to treat the employee in a manner that might have violated the First Amendment with regard to a private citizen. That requires weighing "the First Amendment interest of the employee against the interest of the State, as an employer, in promoting the efficiency of the public services it

33

performs through its employees." *Id.* (citing *Pickering v. Board of Ed.*, 391 U.S. 563, 568, 88 S. Ct. 1731, 1734–35 (1968)); *accord Montone*, 709 F.3d at 195; *Miller v. Clinton County*, 544 F.3d 542, 548 (3d Cir. 2008).

The Supreme Court has described this balancing test as demanding "a fact-sensitive and deferential weighing of the government's legitimate interests." *Board of County Comm'rs v. Umbehr*, 518 U.S. 668, 677, 116 S. Ct. 2342 (1996). Although ultimately an issue of law, this assessment is one that I cannot perform properly within the confines of the Rule 12(b)(6) standard. Ultimately, however, the balancing will have to include the potential for disruption of what must be a close, confidential, and personal working relationship between judge and law clerk. *See Sprague v. Fitzpatrick*, 546 F.2d 560, 565 (3d Cir. 1976) (First Assistant District Attorney's public criticism of D.A. not protected). *See generally Swartzwelder v. McNeilly*, 297 F.3d 228, 235 (3d Cir.2002) (balancing requires consideration of " 'whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise.' ") (quoting *Rankin v. McPherson*, 483 U.S. 378, 388, 107 S. Ct. 2891 (1987)).

I consider finally the allegation of Count I that JLD engaged in a third "protected act under the First Amendment" when he

> [c] "left the courthouse" and did "not participat[e]" in the 1:30 pm *Falcon Ridge* motion hearing.

(2AC ¶ 146)[18]

---

[18]    The retaliation for [c] allegedly consisted of the following:

> [3] Judge Gannon fabricated and circulated to employees, attorneys, and JLD's family a false story that JLD had thrown something and stormed out; and

> [4] he then told JLD he was terminated unless he agreed to enroll in mental health counseling.

(2AC ¶ 148)

Of course there is such a thing as expressive conduct, and it is accorded the same protection as actual speech. *Virginia v. Black*, 538 U.S. 343, 358 (2003). Expressive conduct may be found where "an intent to convey a particularized message was present, and the likelihood was great that the message would be understood by those who viewed it." *Texas v. Johnson*, 491 U.S. 397, 404, 109 S. Ct. 2533, 2539 (1989)(quoting *Spence v. State of Washington*, 418 U.S. 405, 410–11, 94 S. Ct. 2727, 2730 (1974)). That two-part "particularized message" test has been applied to protect, for example, picketing, armband-wearing, flag-waving, and flag-burning. *See Johnson*, 491 U.S. at 404.

Here, I am unable to discern any basis for claiming that this was protected expressive conduct under the First Amendment. The factual allegations in the body of the complaint are that JLD went home because he felt "dizzy from the stress caused by Judge Gannon's conduct during oral arguments." (2AC ¶ 89) He told another person, CJ, that he was "worn out" from a "tough motion week." (¶ 90) There was a motion hearing scheduled at 1:30 pm for the *Falcon Ridge* case, for which JLD believed Judge Gannon had not read the file. JLD "began to feel anxious about sitting through the motion hearing." (¶ 92) He stood over his desk, and told the secretary, LH, he was going home because he was dizzy and "[did]n't feel well." (¶ 92) There was no message, not even an emotive one: "In no way, shape or form, did J.L.D.'s body language, tone, conduct, etc. suggest he was angry, or give anyone the slightest impression that he had 'thrown something;' 'stormed out;' was quitting, or even dissatisfied with his position or Judge Gannon." (2AC ¶ 94) In Count I, JLD stresses the following: "J.L.D. left the courthouse without any disturbance; there were no proceedings taking place when he left the courthouse. Judge Gannon was not present at the Courthouse at this time and J.L.D. did not criticize Judge Gannon in any way to anyone before his departure." (2AC ¶ 146) In short, it appears unlikely that JLD's departure from the courthouse constituted First Amendment activity, or that it was perceived, even

mistakenly, as such. *See Heffernan v. City of Paterson,* __ U.S. __, 136 S. Ct. 1412 (2016).

This Count as a whole, however, alleges First Amendment activity, and I will not dismiss it. Whether and to what extent subsequent acts were retaliatory, or conversely were justified by JLD's actions, cannot be decided on a Rule 12(b)(6) motion. Count I states a claim, and Judge Gannon's motion to dismiss it is therefore denied.

### B.   Deprivation of due process

Count II alleges that Judge Gannon deprived JLD of due process. This count, too, is based on the spreading of the allegedly fabricated story that, when JLD left work on December 5, 2014, he had "stormed out" and "thrown something." On December 9, 2014, Judge Gannon accused JLD directly of having done so, and did not permit him to confront LH, the secretary who had witnessed JLD's departure. He told JLD he was "technically" terminated, that his card key would not work, and that he would be "officially" terminated if he did not seek mental health treatment.

The next day, December 10, 2014, JLD was granted a meeting with Assignment Judge Weisenbeck, Judge Ramsay, HR Director Chait, and the Trial Court Administrator. JLD was reassigned to the Presiding Civil Division Judge, Rosemary E. Ramsay, in Morris County, starting immediately. (¶¶ 107–10) That same day, Judge Gannon rescinded the demand that JLD submit to mental health treatment as a condition of continued employment. JLD never worked for Judge Gannon again, however. Although it is not clearly stated, he seemingly was working for Judge Ramsay when he was dismissed in February 2015.

JLD alleges that he "should have received some sort of hearing or chance to defend himself prior to the spreading of a fabricated story." (2AC ¶ 163) The demand for some sort of prior hearing I interpret as a procedural due process claim. In general, a procedural due process claim requires plaintiff to allege that (1) he was deprived of an individual interest that is encompassed within the Fourteenth Amendment's protection of "life, liberty, or property," and (2)

the procedures afforded him did not constitute "due process of law." *Hill v. Borough of Kutztown*, 455 F.3d 225, 234 (3d Cir. 2006) (quoting *Alvin v. Suzuki*, 227 F.3d 107, 116 (3d Cir. 2000); *accord Iles v. De Jongh*, 638 F.3d 169, 173 (3d Cir. 2011).

I am unaware of any case requiring a hearing prior to the "spreading of a fabricated story." This may be a claim that JLD had a property interest in continued employment by a particular judge, or continued employment by the judiciary. If so, JLD might have been entitled, under some circumstances, to some level of procedure before the transfer or firing could occur. *See generally Bd. Of Regents v. Roth,* 408 U.S. 564, 576, 92 S. Ct. 2701, 2708–09 (1972).

The count, however, is vague and to some degree incoherent. I cannot really discern what the claim, or the deprivation of a property or liberty interest, is alleged to be. The complaint does not state whether JLD was an at-will employee. It does not state whether procedures were available to challenge a transfer or firing, and whether JLD attempted to avail himself of them. It does allege that he was granted a meeting with the relevant authorities, and was granted an immediate transfer to another judge.

If the alleged protected interest is continued employment by Judge Gannon, JLD must allege that. If the protected interest is employment as a clerk, and the deprivation is his termination on February 10, 2015, he must allege that. If so, he must also factually link his claim against Judge Gannon to the termination, which occurred when he was no longer working for Judge Gannon. In short, the allegations remain so unformed that I cannot yet put defendant Gannon to the burden of admitting or denying them. This seems to be an awkward attempt to hammer a defamation claim into the mold of a claim that JLD was deprived of a hearing.

The motion to dismiss Count II as against Judge Gannon is therefore granted. This dismissal is without prejudice to the submission within 30 days of an amended pleading containing a revised version of Count II that sets forth the legal and factual elements of a due process claim.

## V.      STATE LAW CLAIMS

Finally, Counts III, V, and VI assert state statutory and common law tort claims against "all defendants." I set aside the defendants already dismissed from the case on threshold grounds, *see* Section III, *supra*, and analyze the state-law claims in relation to the non-dismissed defendants: Judge Gannon and the Dorsey law firm.

### A.      CEPA "Whistleblower" Claim

Count III asserts a "whistleblower" claim under a New Jersey statute, the Conscientious Employees Protection Act ("CEPA"), N.J. Stat. Ann. § 34:19-1 *et seq.* Under CEPA, the plaintiff must allege (1) a reasonable belief that the employer's conduct violated a law, rule, or regulation [or is fraudulent or criminal]; (2) a whistle-blowing activity; (3) an adverse employment action; and (4) a causal connection between the whistle-blowing activity and the adverse employment action. *See Caver v. The City of Trenton*, 420 F.3d 243, 254 (3d Cir. 2005); *Dzwonar v. McDevitt*, 828 A.2d 893, 900 (N.J. 2003). I review the allegations as to those elements in order.

The first element is that the employer is engaging in activity that the employee "reasonably believes ... is in violation of a law, or a rule or regulation promulgated pursuant to law... or ... is fraudulent or criminal." N.J. Stat. Ann. § 19-3(a)(1) & (2). JLD alleges that he believed that Judge Gannon committed judicial and administrative misconduct. The reasonableness of that belief may be questioned, but reasonableness cannot be assessed within the confines of Rule 12(b)(6).

"Whistle-blowing activity" includes "[d]isclos[ing], or threaten[ing] to disclose [such illegal or fraudulent acts] to a supervisor or to a public body." N.J.Stat. Ann. § 34:19-3(a).  The alleged whistle-blowing activity consists of JLD's speaking to Judge Gannon about his "approach to his judicial and administrative duties" on November 20 and December 1, 2014. There may be serious issues as to whether confronting Judge Gannon himself constitutes

whistleblowing,[19] but the factual allegations of this *pro se* complaint, liberally read, include enough indications of communications to others as well. (In his brief, for example, JLD indicates that the whistleblowing activity may include his December 8 Letter to HR referred to at 2AC ¶ 105.)

"'Retaliatory action' includes discharge, suspension, demotion, or other adverse action involving an employee's terms and conditions of employment." N.J. Stat. Ann. § 34:19-2(e). The alleged adverse employment actions alleged here include Judge Gannon's statement that JLD was "technically" fired and should seek mental health counseling and reassignment; the subsequent reassignment to Judge Ramsay; and his eventual termination in February 2015. (2AC ¶ 173) At the pleading stage, this is sufficient.[20]

The necessary causal connection is alleged, in that JLD says these actions were taken in retaliation for his having spoken to Judge Gannon. Causation must often be inferred from the circumstances; because it is sufficiently alleged, I will not usurp the role of fact finder by attempting to engage in, *e.g.,* the *McDonnell-Douglas* burden-shifting analysis at this stage. *See Blackburn v. United Parcel Serv., Inc.,* 179 F.3d 81, 92 (3d Cir. 1999) (citing *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S. Ct. 1817 (1973)).

---

[19]    Not to mention the rather equivocal nature of the statements: that JDL "wasn't blind to the facts" and that "everyone needs to do their jobs." (2AC ¶¶ 76(c), 80(b))

[20]    The complaint alleges "four adverse employment actions in response to speaking to Judge Gannon about his misconduct:

> a) His future employment opportunities and professional reputation was destroyed by Judge Gannon's fabricated December 5, 2014 story.
> b) Judge Gannon told J.L.D. he had "technically" been terminated, his key-card disabled, and as a condition of employment demanded J.L.D. receive mental health/behavior treatment.
> c) Plaintiff was reassigned to Judge Ramsay and prohibited from explaining the events that lead to the reassignment. Accordingly, it is presumed Plaintiff's reassignment was the result of his personal and professional shortcomings, not Judge Gannon's.
> d) On February 10, 2014 [probable typo for 2015] J.L.D. was terminated."

(2AC ¶ 173) The first action (a) does not seem to constitute an adverse employment action taken by Judge Gannon, but rather a prediction of adverse consequences.

JLD also alleges that no "Whistleblower Act" notice was posted in the workplace. (2AC ¶ 174)

The motion to dismiss Count III, the CEPA claim, is therefore denied as to Judge Gannon. This Count says nothing whatever about the Dorsey firm, however, and the earlier allegations of the complaint suggest no plausible connection between the firm and these CEPA allegations. Count III is therefore dismissed as against defendant Dorsey & Semrau, LLC.

**B.    Defamation or False Light**

Count V asserts claims of defamation and false light against Judge Gannon and the Dorsey firm.

Traditional common law defamation has three essential elements:

> "(1) the assertion of a false and defamatory statement concerning another; (2) the unprivileged publication of that statement to a third party; and (3) fault amounting at least to negligence by the publisher." *Leang v. Jersey City Bd. of Educ.*, 198 N.J. 557, 585, 969 A.2d 1097 (2009) (quoting *DeAngelis v. Hill*, 180 N.J. 1, 13, 847 A.2d 1261 (2004)).

*G.D. v. Kenny*, 984 A.2d 921, 927–28 (N.J. Super. Ct. App. Div. 2009), *aff'd*, 15 A.3d 300 (N.J. 2011). "A defamatory statement is one that is false and 'injurious to the reputation of another' or exposes another person to 'hatred, contempt or ridicule' or subjects another person to 'a loss of the good will and confidence' in which he or she is held by others." *Romaine v. Kallinger*, 537 A.2d 284, 287 (N.J. 1989) (quoting *Leers v. Green*, 131 A.2d 781, 787 (N.J. 1957)). Whether a statement is defamatory is an issue of law, but one that depends on the "content, verifiability, and context of the challenged statements." *Ward v. Zelikovsky*, 643 A.2d 972, 978 (N.J. 1994). The context of a factual record is therefore preferable.

The "false light" tort, which may cover statements not literally false, has two elements:

> (1) "the false light in which the other was placed would be highly offensive to a reasonable person"; and (2) "the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed." [citing *Romaine v. Kallinger*, 537 A.2d 284, 290 (N.J. 1988)] (quoting *Restatement (Second) of Torts*, § 652E).

*Leang v. Jersey City Bd. of Educ.*, 969 A.2d 1097, 1116 (N.J. 2009)

Count V alleges that Judge Gannon told employees, attorneys, and JLD's father "a detailed story about JLD which was fabricated." The reference is obviously to JLD's "storming out" and "throwing something" when he left work during the day on December 5, 2014. JLD alleges that this was harmful to his reputation as a (future) lawyer, because he will now be associated, not just with leaving work, but with violence and angry outbursts in the workplace. He also alleges harm to his family relationships. (2AC ¶¶ 187–90)

That is a sufficient allegation. Judge Gannon raises many issues of fact and privilege, but these must await discovery and summary judgment. The motion to dismiss Count V as against Judge Gannon is denied.

Count V says nothing, however, about the Dorsey firm, and the earlier allegations of the complaint suggest no plausible connection between the firm and these defamation allegations. Count V is therefore dismissed as against defendant Dorsey & Semrau, LLC.

## C.    Intentional or Negligent Infliction of Emotional Distress

Count VI asserts the state law torts of intentional and negligent infliction of emotional distress ("IIED" and "NIED").

To establish IIED under New Jersey law, a plaintiff must allege "intentional and outrageous conduct by the defendant, proximate cause, and distress that is severe." *Buckley v. Trenton Sav. Fund Soc'y*, 544 A.2d 857, 863 (N.J. 1988). "[T]he emotional distress suffered by the plaintiff must be so severe that no reasonable [person] could be expected to endure it." *Taylor v. Metzger*, 706 A.2d 685, 696 (1998) (internal quotations omitted). The distress "must be sufficiently substantial to result in either physical illness or serious psychological sequelae." *Turner v. Wong*, 832 A.2d 340, 348 (N.J. App. Div. 2003).[21]

---

[21]    Employment-related misconduct generally does not constitute the kind of extreme conduct that will give rise to an IIED claim. *Griffin v. Tops Appliance City, Inc.*, 766 A.2d 292, 297 (N.J. Super. App. Div. 2001); *accord Catullo v. Liberty Mut. Group, Inc.*, 2012 WL 762163 at *9 (D.N.J. Mar 6, 2012); *Jewett v. IDT Corp.*, 2008 WL 508486 at *4 (D.N.J. February 20, 2008). In part, this embodies a determination that these

To establish NIED, the plaintiff must demonstrate that: "(a) defendant owed a duty of reasonable care to plaintiff; (b) defendant breached that duty; (c) plaintiff suffered severe emotional distress; and (d) defendant's breach of duty was the proximate cause of the injury." *Dello Russo v. Nagel*, 817 A.2d 426, 435 (App. Div. 2003). For a claim of NIED, "it must be reasonably foreseeable that the tortious conduct will cause genuine and substantial emotional distress or mental harm to average persons." *McDougall v. Lamm*, 48 A.3d 312, 319 (N.J. 2012). As for NIED, most cases have required a demonstration of physical injury to corroborate plaintiff's claims of emotional harm. The cases have made an exception for the kind of shocking conduct—apprehension of immediate personal injury to plaintiff, severe injury to a close relative, mishandling of a corpse—that indisputably would cause severe distress.[22]

Count VI alleges that Judge Gannon regularly made derogatory remarks and "acted immorally" toward JLD, "including asking JLD if he had been molested as a boy."[23] (2AC ¶ 192) JLD implies that he was particularly susceptible, and alleges "on information and belief" that Judge Gannon knew

---

nonspecific torts not be used to swallow up other areas of law—"to circumvent the required elements of or defenses applicable to another cause of action that directly governs a particular form of conduct." *Griffin, supra.*

[22]   *See Jablonowska v. Suther,* 948 A.2d 610, 618 (N.J. 2008); *Decker v. Princeton Packet, Inc.,* 561 A.2d 1122, 1128 (N.J. 1989) (stating that emotional distress cases have evolved "from denying recovery unless the emotional distress is accompanied by physical impact [to the plaintiff], to permitting recovery if the emotional distress results in physical injury [to the plaintiff]," and, finally, to permitting recovery "even in the absence of physical injury," but only under certain conditions). *Portee v. Jafee,* 417 A.2d 521 (N.J. 1980), for example, authorized a NIED claim under the following conditions: "(1) the death or serious physical injury of another caused by defendant's negligence; (2) a marital or intimate, familial relationship between plaintiff and the injured person; (3) observation of the death or injury at the scene of the accident; and (4) resulting severe emotional distress." *Id.* at 528; *See also Strachan v. John F. Kennedy Memorial Hosp.,* 538 A.2d 346 (N.J. 1988) (permitting parents' mental distress claim against hospital for mishandling of son's corpse despite inability to establish *Portee* requirements 1 and 3).

[23]   This goes well beyond what is alleged factually in the body of the complaint, which is that Judge Gannon made a more general reference to a scout leader who allegedly molested boys during a time period that would have encompassed JLD's childhood years. (2AC ¶ 30) JLD now says this was a drafting oversight.

that JLD "was bullied throughout high school and his relationship with his father was not strong." (¶ 195)

The actual tortious conduct complained of is Judge Gannon's spreading of the "fabricated story" and his forcing JLD to participate in his judicial misconduct and "potential[l]y illegal fraudulent activity." (¶¶ 196–97) The injuries alleged in this Count consist of anxiety, sleep loss, lack of trust, damaged relationships, tinnitus, headaches, and the like. (2AC ¶ 198)

As to Judge Gannon, these allegations do not rise to the level of stating a claim for IIED or NIED, and do not allege the requisite level of resulting harm. *See Schillaci v. First Fidelity Bank*, 709 A.2d 1375, 1380-1381 (N.J. Super. App. Div. 1998) (evidence plaintiff was acutely upset as a result of being falsely accused of theft was insufficient to support IIED claim); *Fleming v. United Parcel Service. Inc.*, 604 A.2d 657, 686 (N.J. Super. Law Div. 1992) (plaintiff's generalized nervousness, headaches and depression caused by loss of job and inability to support family after plaintiff was falsely accused of theft failed to support IIED claim). *See also Decker, supra; Portee, supra* (denying NIED claim absent physical impact or certain defined categories of shocking conduct).

Count VI is therefore dismissed as to Judge Gannon.

Unlike the other state law claims, Count VI at least mentions the Dorsey law firm. The firm, it is alleged, "assisted Judge Gannon in obtaining information about J.L.D. in order to evaluate the likelihood he would report Judge Gannon." (¶ 194) The allegations that the Dorsey firm somehow groomed or screened JLD, however, rest on unsustainable inferences from allegations made on information and belief. (*See* pp. 5–6, *supra*, summarizing 2AC ¶¶ 51–63) Even as to Judge Gannon, no claim is stated; *a fortiori,* these minimal allegations against the Dorsey firm do not state a claim of IIED or NIED. Count VI is dismissed as against defendant Dorsey & Semrau, LLC.

## IV.    CONCLUSION

For the foregoing reasons, the motion of the Estate of Edward V. Gannon is GRANTED IN PART in that all Counts are dismissed against Gannon in his official capacity, with prejudice. Counts II and VI are also dismissed as against Gannon in his personal capacity for failure to state a claim, without prejudice to the filing of an amended complaint within 30 days. Gannon's motion to dismiss is otherwise DENIED.

The Rule 12(b)(6) motion of defendant Dorsey & Semrau, LLC, to dismiss the complaint in its entirety for failure to state a claim is GRANTED without prejudice to the filing of an amended complaint within 30 days.

The motion of the State Defendants to dismiss the complaint in its entirety is GRANTED. Because this dismissal is based on subject matter jurisdiction, immunity, and amenability to suit, it is with prejudice.


Dated:        July 29, 2016
              Newark, New Jersey


                                        **HON. KEVIN MCNULTY**
                                        **United States District Judge**